Thomas Corcovelos (CA Bar No. 70493)
CORCOVELOS LAW GROUP
1001 Sixth Street, Suite 150
Manhattan Beach, California 90266-6750
Telephone: (310) 374-0116
Telecopier: (310) 318-3832
Email:  corforlaw@corforlaw.com

[Proposed] Attorney for Mammoth Arrowhead I, LLC,
Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>**MAMMOTH ARROWHEAD I LLC**<br><br>Debtor. | Case No.  8:09-bk-22567-RK*<br><br>Chapter  11<br><br>**DEBTOR'S DISCLOSURE STATEMENT DESCRIBING DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION**<br><br>Disclosure Statement Hearing<br><br>Date:<br><br>Time:<br><br>Place:<br><br><br>Plan Confirmation Hearing<br>[See Disclosure Statement for Voting and Objection Procedures]<br><br>Date:     [To Be Set]<br><br>Time:     [To Be Set]<br>Place: |

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

1
2
3

# TABLE OF CONTENTS

**INTRODUCTION**........................................................ 1
A. Purpose of This Document.......................... 7
B. Deadlines for Voting and Objecting; ......................
Date of Plan ....................................................... 9
Confirmation Hearing ........................................
1.Time and Place of the Confirmation Hearing ................ 9
2.Deadline For Voting For or Against the Plan ............... 9
3.Deadline For Objecting to the Confirmation of the Plan .... 10
4. Identity of Person to Contact for More Information ..........
   Regarding the Plan............................. 10
C.Disclaimer............................................ 11
A.Definitions........................................... 15
B.Interpretations,Computation of Time and Governing Law ...... 288
1. Undefined Terms ....................................... 29
2.Rules of Interpretation................................ 29
3.Computing Time Periods ................................ 31
4.Section Numbers ...................................... 31
5.Notices and Delivery of Documents .................... 31


**BACKGROUND** ............................................. 32
A.Description and History of the Debtor's Business .......... 31
B.Principals/Affiliates of Debtor's Business ................ 37
C.Management of the Debtor Before and After the Bankruptcy .... 37
D.Events Leading to Chapter 11 Filing ....................... 37
E.Significant Events ....................................... 43
1.Bankruptcy Proceedings.................................. 44
2.Other Legal Proceedings................................ 43
3.Actual and Projected Recovery of Preferential or
   Fraudulent  Transfers .............................. 44
4.Procedures Implemented to Resolve Financial Problems ...... 44
5.Current and Historical Financial Conditions .............. 45

**SUMMARY OF THE PLAN OF REORGANIZATION** ....................... 45
A.What Creditors and Interest Holders Will Receive Under The ....
Proposed Plan........................................... 45
B.Unclassified Claims..................................... 46
1.Administrative Expenses................................. 46
2.Priority Tax Claims.................................... 47
C.Classified Claims and Interests ........................ 49
1. Classes of Secured Claims............................. 49
2. Classes of Priority Unsecured Claims  ................ 56
3. Class of General Unsecured Claims .................... 57
4. Class(es) of Interest Holders ....................... 59
5. Resolution of State Court Actions ................... 60
D. Means of Effectuating the Plan ...................... 60
1.Funding for the Plan.................................. 60

4
5
6
7
8
9
10
11
12
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

2.Post-Confirmation Management.................................. 60
3.Disbursing Agent............................................. 61
E.Risk Factors................................................ 61
F.Other Provisions of the Plan................................ 61
1.Executory Contracts and Unexpired Leases.................... 61
a.Assumptions    ............................................. 61
b.Rejections................................................. 62
2. Changes in Rates Subject To Regulatory Commission ......... 63
3.Retention of Jurisdiction................................... 63
G.Tax Consequences of Plan.................................... 63

**CONFIRMATION REQUIREMENTS AND PROCEDURES** ..................... 73
A.Who May Vote or Object...................................... 65
1.Who May Object to Confirmation of the Plan ................. 65
2.Who May Vote to Accept/Reject the Plan ..................... 65
a.What Is an Allowed Claim/Interest .......................... 65
b.What Is an Impaired Claim/Interest ......................... 66
3.Who Is <u>Not</u> Entitled to Vote.............................. 66
4. Who Can Vote in More Than One Class ........................ 67
5.Votes Necessary to Confirm the Plan ........................ 77
6.Votes Necessary for a Class to Accept the Plan ............. 67
7.Treatment of Nonaccepting Classes .......................... 68
8.Request for Confirmation Despite Nonacceptance by Impaired ....
Class(es)      ............................................... 68
B.Liquidation Analysis........................................ 69
C. Feasibility ............................................... 83
**EFFECT OF CONFIRMATION OF PLAN**............................... 75
A.Discharge .................................................. 76
B.Revesting of Property in the Debtor ........................ 76
C.Modification of Plan........................................ 76
D. Post-Confirmation Status Report ........................... 76
E.Post-Confirmation Conversion/Dismissal ..................... 76
F.Final Decree............................................... 77

**SUPPORTING DECLARATIONS**...................................... 79
EXHIBIT A - LIST OF All ASSETS................................. 80
EXHIBIT B - LIST OF LITIGATION/SUMMARY OF LITIGATION ......... 82
EXHIBIT C - FINANCIAL PROJECTIONS ........................... 83
EXHIBIT D - LIST OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES
            TO BE ASSUMED ...................................... 84
EXHIBIT E- LIST OF GENERAL UNSECURED CREDITORS .............. 85
EXHIBIT F- LIST OF Equity Interest Holders .................. 86
EXHIBIT G- LAST TWO YEARS FINANCIAL STATEMENTS .............. 87

Corcovelos Law Group

Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

1
2
3
4
5
6
7
8
9
10
11
12
14
15
18
19
20
21
22
23
24
25
26
27
28

# I. INTRODUCTION

MAMMOTH ARROWHEAD I, LLC the Debtor in this Case[1], provides this Disclosure Statement to all of its Creditors, Equity Security Holders, and to other parties in interest in the Case.

The Debtor commenced its Bankruptcy case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code, ("Code") Sections 101-1330, on November 12, 2009 (the "Petition Date"). The Debtor is continuing in the operation and management of its business pursuant to Bankruptcy Code Sections 1107 and 1108.

Section 1125 of the Bankruptcy Code requires that, at the time when the Plan is delivered to Creditors, the Plan be accompanied by this Disclosure Statement[2]. The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, so far as is reasonably practicable, in light of the nature and history of the Debtor and the condition of the Debtor's books and records, to enable a typical Creditor or Equity Security Holder to make an informed judgment about the Plan and to enable such Creditor or Equity Security Holder to

---

[1]    The definitions of the capitalized terms used in this Disclosure Statement are contained in Section II. of this Disclosure Statement.

[2]    Section 1125(b) provides, in pertinent part, as follows:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. . . .

> 11 U.S.C. § 1125(b) (2003).

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

1  determine whether it is in his best interest to vote for (accept)

2  or against (reject) the Plan.

3      Chapter 11 of the Bankruptcy Code allows debtors, and under

4  some circumstances, creditors and other parties in interest, to

5  propose a plan of reorganization.  The plan may provide for

6  debtors to reorganize by continuing to operate, to liquidate by

7  selling assets of the estate, or a combination of both.  The

8  Debtor is the party proposing the Plan sent to you in the same

9  envelope as this document.  THE DOCUMENT YOU ARE READING IS THE

10 DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.  This Disclosure

11 Statement contains a description of the Plan and other

12 information relevant to the decision whether to vote to accept or

13 to reject the Plan.  The Debtor urges you to read this Disclosure

14 Statement because it contains important information concerning

15 the Debtor's history, business, assets, and liabilities and sets

16 forth a summary of the Plan.

17     The Debtor's Plan is a reorganization plan accomplished

18 through the continuation of Debtor's primary business, the

19 management and lease-up of commercial real estate. In other

20 words, the Plan Proponent (i.e., the Debtor) seeks to accomplish

21 payment under the Plan primarily through the cash flow generated

22 from the leasing of the Mammoth Property and through proceeds

23 from a future sale or refinance of the Mammoth Property.  The

24 Plan may provide for the Debtor to reorganize by continuing to

25 operate and refinance or, to liquidate by selling assets of the

26 estate, or a combination of both.  The Debtor, MAMMOTH ARROWHEAD

27 I LLC is the party proposing the Plan sent to you in the same

28

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

1  envelope as this document.  THE DOCUMENT YOU ARE READING IS THE

2  DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.

3  This is a <u>reorganizing</u> Plan.  In other words, the Proponent

4  seeks to accomplish payments under the Plan by <u>restructuring one</u>

5  <u>note held by Comerica Bank and converting mechanics liens to</u>

6  <u>deeds of trust.  Secured creditors of the estate shall be paid</u>

7  <u>the present value of their claim at a market interest rate over a</u>

8  <u>60 month period, excepting that their claims may be paid in full</u>

9  <u>prior to the sixtieth month through a sale or refinance of the</u>

10 <u>Mammoth Property.</u>  The Effective Date of the proposed Plan is

11 October 20, 2010.

12 The Distributions under the Plan will be made from

13 available Cash and Net Sale Proceeds.

14 The Plan will be implemented through the following means:

15 • Robert Wish the Managing Member of the Debtors

16 current manager, will provide oversight and assistance in the

17 operation of the Debtor's business and day-to-day management

18 decisions.  Robert Wish will work to lease the remaining vacant

19 space in the Mammoth Property.

20

21 • The proceeds generated from the leases on the

22 Mammoth Property and any future refinance or sales proceeds

23 generated by the Mammoth Property will be used to fund the

24 payments to both Secured and Unsecured Creditors provided for

25 under the Plan. It is anticipated that there will be sufficient

26 funds from these proceeds to pay all Allowed Secured and Allowed

27 Unsecured Claims as follows:

28

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

- Secured Creditor Comerica Bank shall be paid in full on or before the 60th month following the Effective Date, Secured Creditor Rotsheck Construction shall be paid in full on or before the 60th month following the Effective Date, Allowed Class 3 General Unsecured Claims may elect to receive a one-time lump sum payment equal to 50% of their allowed claim as payment in full on the 13th month following the Effective Date or 100% of their allowed claim as payment in full on or before the 60th month following the Effective Date.

**A MORE COMPLETE DESCRIPTION OF THE PROVISIONS OF THE PLAN AND THE MEANS OF EFFECTUATING THE PLAN ARE LOCATED AT SECTION IV.D. BELOW.**

**A.    Purpose of this Document**

This Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.  This Disclosure Statement does not purport to be a complete description of the Plan, the financial data pertaining to the Debtor's business operations, the applicable provisions of the Bankruptcy Code, or any other matter which may be deemed significant by Creditors or Interest Holders.  Out of practical necessity, this Disclosure Statement represents an attempt to summarize extensive overall data, legal documents and legal principles, including provisions of the Bankruptcy Code, and to set them forth in understandable, readable form.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

1. **WHO CAN VOTE OR OBJECT;**

2. **WHAT THE TREATMENT OF YOUR CLAIM IS, (i.e., what your claim will receive if the Plan is confirmed) AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**

3. **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY;**

4. **WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

5. **WHAT IS THE EFFECT OF CONFIRMATION; AND**

6. **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.  Be sure to read the Plan as well as all of this Disclosure Statement.

The Code requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The Bankruptcy Court has conditionally approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.  Any party can now solicit votes for or against the Plan.  However, the statements and conclusions set forth in this document are, unless otherwise noted, those of the Proponent of the Plan.  The accuracy has not yet been determined by the Court, and the Court may determine such accuracy at the hearing regarding whether or not to confirm the Plan.

**B.** **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

**THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL CREDITORS AND INTEREST HOLDERS IN THE CASE.**

**1.** **Time and Place of the Confirmation Hearing**

The hearing where the Court will determine whether or not to confirm the Plan will take place on _____, 2010, at _____ A.M., Courtroom _____

Deadline for Voting for or Against the Plan

If you are entitled to vote, it is in your best interest to vote timely on the enclosed ballot

and return the ballot in the enclosed envelope to **Corcovelos Law Group**, to the attention of Tom Corcovelos 1001 Sixth Street, Suite 150  Manhattan Beach, CA 90266 Telephone: (310)-374-0116. Your ballot must be received by _____, 2010, at 5:00 P.M. Pacific Standard Time, or it will not be counted.

Since mail delays may occur, and because time is of the essence, it is important that ballots be mailed well in advance of the date specified hereinabove as the deadline for **Corcovelos Law Group** to receive ballots.  Any ballots received after that date will not be included in any calculation to determine whether the Debtor's Creditors and Interest Holders have accepted or rejected the Plan.

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

**2.    Deadline for Objecting to the Confirmation of the Plan**

Objections to the confirmation of the Plan must be filed with the Court and served upon **Corcovelos Law Group**, to the attention of Thomas C Corcovelos  1001 Sixth Street, Suite 150 Manhattan Beach, CA 90266, Telephone: (310)-374-0116, by _____, 2010, at 5:00 P.M. Pacific Standard Time.

At the Confirmation Hearing, the Bankruptcy Court will determine, pursuant to Section 1129 of the Bankruptcy Code, whether the Plan has been accepted by the necessary Classes of Claims and Interests created under the Plan, and if not, whether the Bankruptcy Court should nevertheless confirm the Plan.  If at the Confirmation Hearing the Bankruptcy Court determines that the Plan meets all of the requirements for confirmation prescribed by the Bankruptcy Code, the Bankruptcy Court will enter a Confirmation Order.  Pursuant to Section 1141 of the Bankruptcy Code, the effect of the Confirmation Order will be to make the provisions of the Plan binding upon the Debtor and each of its Creditors and Interest Holders, regardless of whether each Creditor or Interest Holder voted to accept the Plan.

**3.    Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan may contact Thomas C Corcovelos at **Corcovelos Law Group**, 1001 Sixth Street, Suite 150 Manhattan Beach, CA 90266, Telephone: (310)-374-0116

C.  **Disclaimer**

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

The Plan involves the payment of Claims from available Cash, from cash flow generated through the leasing of the Mammoth Property, from a refinance of the Mammoth Property, or from the Net Sales Proceeds from the sale of the Mammoth Property.  The Debtor projects that there will be sufficient funds available to make the payments called for under the Plan.  The Debtor's financial projections filed in support of the Plan (included in **Exhibit C** attached hereto**)** were prepared by the Debtor.

THE PROJECTIONS SET FORTH IN THIS DISCLOSURE STATEMENT REPRESENT A PREDICTION OF FUTURE EVENTS BASED UPON CERTAIN ASSUMPTIONS SET FORTH WITH SUCH PROJECTIONS.  THESE FUTURE EVENTS MAY OR MAY NOT OCCUR, AND THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS WHICH WILL OCCUR. BECAUSE OF THE UNCERTAINTIES INHERENT IN PREDICTIONS OF FUTURE EVENTS, THE DEBTOR'S ACTUAL CASH FLOW MAY WELL BE DIFFERENT FROM THAT PREDICTED, AND SUCH DIFFERENCE MAY BE MATERIAL AND ADVERSE TO THE INTERESTS OF THE CREDITORS.

The projections are intended to assess the future cash flow available to the Debtor for making the distributions required by the Plan.  Significant assumptions underlying the financial projections include the following:

1.    Effective Date of the Plan

For the purpose of the Projections, the Debtor estimates that the Confirmation Date will occur in or about August 20, 2010 and hence, that the Effective Date will occur in or about October 20, 2010 with first payments under the plan being made on November 19, 2010.

2.    Earnings Generated by the Mammoth Property

The Debtor's projection of the future earnings which will be generated by the Mammoth Property is derived from Debtor's estimate of the revenue which the Mammoth Property will generate after the Confirmation Date.

3.    Expenses of the Debtor

The Debtor has assumed, for the purpose of the Projections that their expenses will not increase by any significant amount, except as specifically set forth in the Projections, during the term of the Plan.

The information contained in this Disclosure Statement is provided by the Debtor.  The Plan Proponent represents that everything stated in the Disclosure Statement is true to the Proponent's best knowledge.  The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

The financial data relied upon in formulating the Plan is based on the Debtor's post-petition financial projections, the Debtor's Bankruptcy Schedules, Robert Wish's development and management experience, and the financial information contained in pleadings filed with the Bankruptcy Court.  This information was not audited or reviewed by an independent accountant and the Debtor is unable to warrant or represent that such financial information is without any inaccuracies, although Debtor believes it has made reasonable efforts under the circumstances to present such financial information fairly and accurately.  The Debtor

represents that everything stated in the Disclosure Statement is true to the best of Debtor's knowledge. The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

**THIS IS A SOLICITATION BY THE DEBTOR. THE REPRESENTATIONS HEREIN ARE THOSE OF THE DEBTOR AND NOT OF ITS ATTORNEYS OR CONSULTANTS. NO REPRESENTATIONS CONCERNING THE DEBTOR OR POST-CONFIRMATION DEBTOR, INCLUDING, BUT NOT LIMITED TO, REPRESENTATIONS AS TO THE POST-CONFIRMATION DEBTOR'S FUTURE ACTIVITIES, THE VALUE OF ITS PROPERTY, THE AMOUNT OF CLAIMS AGAINST THE DEBTOR'S ESTATE, OR ANY TAX EFFECT OF THE TRANSACTIONS PROPOSED UNDER THE PLAN, ARE AUTHORIZED BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN THAT ARE IN ADDITION TO OR DIFFERENT FROM THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY PARTY IN INTEREST. ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO THE DEBTOR'S ATTORNEYS WHO, IN TURN, WILL DELIVER THE INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS THE BANKRUPTCY COURT MAY DEEM TO BE APPROPRIATE.**

**UNLESS SPECIFICALLY SET FORTH HEREIN TO THE CONTRARY, THE INFORMATION CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT REGARDING THE DEBTOR HAS NOT BEEN SUBJECT TO CERTIFIED AUDIT. RECORDS KEPT BY THE DEBTOR RELY FOR THEIR ACCURACY ON BOOKKEEPING PERFORMED INTERNALLY BY THE DEBTOR. THE DEBTOR BELIEVES THAT EVERY REASONABLE EFFORT HAS BEEN MADE TO PRESENT FINANCIAL**

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

INFORMATION AS ACCURATELY AS IS REASONABLY PRACTICABLE GIVEN THE NATURE AND HISTORY OF THE DEBTOR'S BUSINESS AND THE CONDITION OF THE DEBTOR'S BOOKS AND RECORDS.    HOWEVER, THE FINANCIAL INFORMATION CONTAINED HEREIN REGARDING THE DEBTOR IS NEITHER WARRANTED NOR REPRESENTED TO BE FREE OF INACCURACY.    COUNSEL FOR THE DEBTOR HAS NOT INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN AND MAKES NO REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE ACCURACY THEREOF.

ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO REVIEW CAREFULLY THE PLAN AND THIS DISCLOSURE STATEMENT PRIOR TO VOTING ON THE PLAN.    THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED IN ANY MANNER TO BE LEGAL, BUSINESS, OR TAX ADVICE.    EACH CREDITOR AND OTHER PARTY IN INTEREST SHOULD CONSULT WITH HIS OWN LEGAL COUNSEL, BUSINESS ADVISOR, CONSULTANT, AND/OR ACCOUNTANT PRIOR TO VOTING TO ENSURE A COMPLETE UNDERSTANDING OF THE TERMS OF THE PLAN.    THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THE CREDITORS AND INTEREST HOLDERS OF THE DEBTOR TO ENABLE THEM TO MAKE AN INFORMED DECISION REGARDING THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT INDICATES ONLY THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION FOR THE PURPOSE OF SOLICITATION OF ACCEPTANCES TO THE PLAN BY THE DEBTOR, ASSUMING IT IS ACCURATE.    HOWEVER, THE BANKRUPTCY COURT HAS NOT YET DETERMINED THE ACCURACY OF SUCH INFORMATION.    IT MAY DO SO AT THE CONFIRMATION HEARING.

DEFINITIONS, INTERPRETATIONS, AND RULES OF CONSTRUCTION

1.  "**Administrative Claim**" means a Claim for costs and expenses of the administration of the Case under Sections 503(b) or 507(b) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor (such as wages, salaries, or commissions for services); (b) all Claims of professionals employed at the expense of the Estate; and (c) any fees or charges assessed against the Estate under 28 U.S.C. § 1930.

2.  "**Allowed Administrative Claim**" means an Administrative Claim allowed pursuant to Sections 503(b) or 507(b) of the Bankruptcy Code.

3.  **Allowed Amount** means the amount of any Claim against the Debtor determined in accordance with Sections 502 and 506(a) of the Bankruptcy Code and any other applicable Section of the Bankruptcy Code, and recognized by the Debtor as value or allowed by Final Order of the Court, except to the extent described or defined otherwise herein.

4.  "**Allowed Claim**" means a Claim: (a) with respect to which a Proof of Claim has not been filed but the Claim has been listed in the Schedules filed with the Bankruptcy Court by the Debtor and not listed as disputed, contingent, or unliquidated as to amount and as to which no objection is filed within the time period fixed by the Bankruptcy Court, or as to which any such objection has been determined by a Final Order; or (b) with respect to which a Proof of Claim has been filed within the time period fixed by the Bankruptcy Court, and as to which no

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

objection is filed within the time period fixed by the Bankruptcy Court, or as to which any such objection has been determined by a Final Order. **Class _____ Claim** means an Allowed Claim in the particular Class described.

5. **Allowed Class ____ Interest** means an Allowed Interest in the particular Class described

6. **Allowed Class ____ Interest** means an Allowed Interest in the particular Class described

7. "**Allowed General Unsecured Claim**" means an unsecured Allowed Claim against the Debtor, however arising, not entitled to priority under Section 507(a) of the Bankruptcy Code, including, without limitation, an Allowed Claim based on the rejection of an executory contract or unexpired lease.

8. "**Allowed Priority Claim**" means an Allowed Administrative Claim, Allowed Priority Tax Claim, or Allowed Priority Unsecured Claim.

9. "**Allowed Priority Tax Claim**" means an Allowed Claim entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

10. "**Allowed Priority Unsecured Claim**" means an Allowed Claim entitled to priority pursuant to Sections 507(a)(3), 507(a)(4), or 507(a)(6) of the Bankruptcy Code.

11. "**Allowed Secured Claim**" means an Allowed Claim secured by a lien, security interest or other charge against property in which the Estate has an interest, or which is subject to setoff under Section553 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section 506(a) of the

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

Bankruptcy Code, of the interest of the holder of such Allowed Secured Claim in the Estate's interest in such property, or to the extent of the amount subject to any setoff, as the case may be.

12. "**Amended COMERICA BANK Security Documents**" means the COMERICA BANK SECURITY DOCUMENTS as they relate to the COMERICA BANK first trust deed encumbering the Mammoth Property, as amended pursuant to the Plan.

13. "**Approved Date**" means the date on which an Order approving the Disclosure Statement, or an amended version thereof, is entered by the clerk on the Court's docket.

14. **Arrowhead I**" means MAMMOTH ARROWHEAD I the owner of the Arrowhead Property.

15. "**Arrowhead Loan**" or "**Arrowhead Note**" means the note and deed of trust executed in favor of PFF encumbering the Arrowhead Property and guaranteed by Robert Wish and Mammoth Equities.

16. "**Arrowhead Property**" means the four-story 81,457 Square foot Class A office building located on 17505 North 79th Avenue, Glendale, Arizona.

17. "**Avoidance Action**" means any action which is filed or which may be filed pursuant to the provisions of Sections 510, 542, 543, 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code, any actions based on applicable nonBankruptcy law that may be incorporated or brought under the foregoing sections of the Bankruptcy Code, or any other similar action or proceeding filed to recover property for or on behalf of the Estate or to avoid a lien or transfer.

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

18. "**Ballot**" means the form distributed to holders of claims and interests on which is to be stated an acceptance or rejection of the Plan.

19. "**Bankruptcy Code**" means Title 11 of the United States Code, as now in effect or hereafter amended.  All citations in the Plan to section numbers are to the Bankruptcy Code unless otherwise expressly indicated.

20. "**Bankruptcy Court**" means the United States Bankruptcy Court for the **District of Arizona, ** Division, which has jurisdiction over the Case and the Estate of the Debtor, or such successor court or tribunal as may hereafter be confirmed or created by lawful authority with power to confirm reorganization plans under Chapter 11 of the Bankruptcy Code and all applicable statutes, rules, and regulations pertaining thereto.

21. "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for use in the Bankruptcy Court, as now in effect or hereafter amended.

22. **Bar Date**" means the last date for filing Proofs of Claim other than Administrative Claims or Claims based upon the rejection of any executory contracts or unexpired leases.  The Bar Date for filing Proofs of Claim was set by the Bankruptcy Court as _____.

23. **Business Day**" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

24. "**Case**" means the Debtor's Chapter 11 case which was filed in the Bankruptcy Court, as Case 8:09-bk-22567-RK-

Corcovelos Law Group

Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

25. **"Cash"** means cash and cash equivalents, including, but not limited to, checks or similar forms of payment or exchange.

26. **"Claim"** means: (a) a right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

27. **"Claimant"** means the holder of a Claim.

28. **"Class"** means a grouping into which Claims or Interests which are substantially similar to other Claims or Interests have been classified pursuant to Article IV of the Plan.

29. **"Comerica"** or **"Comerica Bank "** means Comerica Bank the holder of the beneficial interest in the first deed of trust encumbering the Mammoth Property.

30. **"COMERICA BANK NOTE"** or means that certain promissory Note secured by a first deed of trust encumbering the Mammoth Property, in the amount of $15,500,000 as of the petition date, of Comerica Bank, including all amendments and modifications thereto. Said Note was originally in the principal amount of $18,585,000 as of June 27, 2007 and was subsequently reduced to 15,500,000 on in February, 2008 pursuant to the Comerica Loan Modification Agreement.

31. **<u>COMERICA BANK FIRST NOTE</u>** means that certain recourse promissory note to be executed by the Reorganized Debtor as maker in favor of the current holder of the COMERICA BANK NOTE pursuant to the Plan in an amount equal to the amount of the Comerica Bank Claim secured by a first deed of trust encumbering the Mammoth Property as of the Effective Date.

32. **<u>COMERICA BANK SECURITY DOCUMENTS</u>** means all documents creating or evidencing a first priority lien secured by Mammoth Property as all such documents may have been amended or modified from time to time, including, without limitation, that certain Deed of Trust with Assignment of Rents dated JULY 3, 2007.

33. **<u>Comerica Bank State Court Actions</u>** * means the JULY 31, 2009 "Loan Maturity, Demand for Payment in Full and Imminent legal Action, (Notice of Maturity)".

34. **<u>Comerica Loan Modification Agreement</u>" or "<u>Loan Modification</u>** means that certain Loan Modification Agreement entered into between the Debtor and Comerica in February, 2008. Pursuant to the Loan Modification, the "Holdback Funds" were reduced by $3,085,000, and the remaining $1,000,000 was reallocated and set aside as an interest reserve[1].  As a result of the Loan Modification, the outstanding principal balance on Comerica Note was reduced to $15,500,000.

35. **<u>Confirmation</u>** means the entry of the Confirmation Order by the Bankruptcy Court.

---

[1]/ All original loan documents were updated, ratified, and reaffirmed by the parties to the Loan and the Modification.

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

36. "**Confirmation Date**" means the date on which the Confirmation Order is entered by the Bankruptcy Court.

37. "**Confirmation Hearing**" means the hearing, including any continued or postponed session thereof, at which time the Bankruptcy Court will consider and determine whether to confirm the Plan.

38. "**Confirmation Order**" means the order, as entered, of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

39. "**Creditor**" means the holder of an Allowed Claim.

40. "**Debtor**" means MAMMOTH ARROWHEAD I LLC organized under the laws of the state of Arizona the debtor and debtor-in-possession in the Case.

41. **Disallowed Claim**" means a Claim against the Debtor, which Claim is disallowed pursuant to an order of the Bankruptcy Court as to which eleven (11) calendar days have passed following entry of such order and no stay pending an appeal of such order is obtained during such period

42. **Disbursing Agent**" means the person or entity charged with making Distributions pursuant to the terms of the Plan. Pursuant to the Plan, the Reorganized Debtor will serve as the Disbursing Agent under the Plan.

43. "**Disclosure Statement**" means the Disclosure Statement (and all exhibits or schedules annexed thereto or referenced therein) which accompanies the Plan, as the Disclosure Statement may be amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code and Bankruptcy Rules.

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

44. "**Disputed Claim**" means any Claim: (a) listed on the Debtor's Schedules as unliquidated, disputed, or contingent; or (b) as to which the Debtor, or any other party in interest, has interposed a timely objection or request for estimation or subordination in accordance with the Bankruptcy Code and the Bankruptcy Rules, which objection or request for estimation or subordination has not been withdrawn or determined by a Final Order. A Claim will be considered a Disputed Claim in its entirety if an objection is timely filed to any portion of such Claim.

45. "**Disputed Claims Reserve Account**" means the segregated account to be created for holding the pro-rata share of any Disputed Claims pending final resolution of the Disputed Claim.

46. "**Distribution**" means the Cash which is required to be distributed under the Plan to the holders of Allowed Claims.

47. "**Effective Date**" means the date not later than ninety (90) days following the date upon which the Confirmation Order becomes a Final Order; provided, however, that, if an appeal of the Confirmation Order is timely filed, the Debtor may elect to cause the Plan to become effective, notwithstanding the pendency of such appeal, so long as no stay of the Confirmation Order is in effect, by filing with the Bankruptcy Court a notice of such election, in which event the Plan will become effective as provided herein.

48. "**Equity Security Holder**" means the holder of an Interest in the Debtor.

49. "**Estate**" means the estate created under Section 541 of the Bankruptcy Code in the Case.

50. "**Exhibits**" means those exhibits annexed to the Plan or Disclosure Statement or incorporated by reference in the Plan or Disclosure Statement.

51. "**File**," "**Filed**," or "**Filing**" means filed with the Bankruptcy Court having jurisdiction over the Case.

52. "**Final Distribution**" means, for each Class, the last Distribution to be made to holders of Allowed Claims in that Class.

53. "**Final Order**" means an order or judgment of the Bankruptcy Court, or of any court of competent jurisdiction where there is pending an action in which the Debtor is a party, which has not been reversed, stayed, modified, or amended, and as to which: (a) the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for reargument or rehearing shall then be pending; or (b) any right to appeal, petition for certiorari, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor; or (c) any appeal, petition for certiorari, reargument or rehearing has been resolved by the highest court to which the order or judgment was appealed timely or from which certiorari, reargument, or rehearing was sought.

54. "**Financial Projections**" means the financial statements prepared by the Debtor which sets forth, among other things, the

Debtor's cash flow projections, and which is attached as Exhibit "C" hereto.

55. "**General Unsecured Claim**" means an unsecured Claim against the Debtor that is not entitled to priority under Section 507(a) of the Bankruptcy Code, including, without limitation, a Claim based on the rejection of an executory contract or unexpired lease.

56. "**Guarantors**" means Robert Wish, Michael F. Sitzer, and Mammoth Equities, the Guarantors of the Comerica Bank Note.

57. "**Interest**" means a membership interest in the Debtor.

58. "**Mammoth Adversary Proceeding**" means the lawsuit previously pending in state court against Comerica Bank known as MAMMOTH ARROWHEAD I , an Arizona Limited Liability Company; MAMMOTH EQUITIES, LLC, a Nevada limited liability company, Robert L. Wish, and Carol Lechiara, trustee of the Rayvercar International Trust vs. Comerica Bank, A California Corporation; and DOES 1 through 100, inclusive, "case No. 30-2009-00305211 that the Debtor removed to bankruptcy court On December 10, 2009 as an adversary proceeding in bankruptcy court, case No. 6:09-ap-01713.*

59. "**Mammoth Arrowhead or Mammoth Partnership**" means MAMMOTH ARROWHEAD I, the debtor and debtor in possession.

60. "**Mammoth Equities**" means Mammoth Equities, LLC the managing member of the Debtor.

61. "**Mammoth Land**" means the 4.4 net acres of land upon which the Mammoth Property was constructed.

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

62. "**Mammoth Loan**" means the loan encumbering the Mammoth Property, specifically the COMERICA BANK NOTE.

63. "**Mammoth Property**" means the four-story 81,457 Square foot Class A office building located on 17505 North 79th Avenue, Glendale, Arizona.

64. "**Mammoth State Court Actions**" means the lawsuit previously pending in state court against COMERICA BANK known as MAMMOTH ARROWHEAD I , an Arizona Limited Liability Company; MAMMOTH EQUITIES, LLC, a Nevada limited liability company Robert L. Wish, and Carol Lechiara, trustee of the Rayvercar International Trust; vs. Comerica Bank, A California Corporation ; and DOES 1 through 100, inclusive, "case No. 30-2009-00305211.*

65. "**Net Sales Proceeds**" means all of the Cash proceeds from the sale of the assets of the Estate minus all costs of sale and administrative expenses of the Estate including, but not limited to, the fees and expenses of the Disbursing Agent and Professionals employed by the Estate, income taxes and payments pursuant to the Plan to creditors holding Allowed Administrative Claims, Allowed Priority Claims and/or Allowed Secured Claims.

66. "**Order**" means an order or judgment of the Bankruptcy Court as entered on the Court's docket.

67. "**Person**" means any individual, corporation, general partnership, limited partnership, association, joint stock company, joint venture, estate, trust, government or any political subdivision, governmental unit (as defined in the

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

Bankruptcy Code) or official committee appointed by the United States Trustee.

68. "**Petition Date**" means November 12, 2009, the date on which the Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code, commencing the Case.

69. "**Plan**" means the Debtor's Chapter 11 Plan of Reorganization, as the Plan may be amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code and Bankruptcy Rules.

70. "**Post-Confirmation Estate Claims**" means any and all claims and causes of action which constitute property of the Estate including, but not limited to, any Avoidance Actions, whether or not such claims or causes of action are the subject of litigation pending as of the Effective Date.

71. "**Post-Petition Earnings**" means any funds received by Debtor since the Petition Date.

72. "**Reorganized Debtor**" means the Debtor, MAMMOTH ARROWHEAD I LLC, an Arizona Limited Liability Company, on and after the Effective Date, the entity which shall assume all of the rights and obligations of the Debtor together with title to and control of the Debtor's assets and liabilities upon Confirmation of the Plan, as such rights, obligations, assets and liabilities are modified in the Plan.

73. "**Robert Wish**" means Robert Wish, the managing member of Mammoth Equities LLC, the Manager of MAMMOTH ARROWHEAD I LLC.

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

74. **"Rotsheck Construction"** means Rotsheck Construction Inc., the holder of a $3,550 mechanics lien recorded against the Mammoth Property.

75. **"Schedules"** means the Schedules of Assets and Liabilities and Statement of Financial Affairs filed by the Debtor in the Case, as amended, modified, or supplemented from time to time.

76. **"Secured Claim"** means a Claim secured by a lien, security interest or other charge against property in which the Estate has an interest, or which is subject to setoff under Section553 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such Secured Claim in the Estate's interest in such property, or to the extent of the amount subject to any setoff, as the case may be.

77. **"Secured Creditor"** shall mean the holder of an Allowed Secured Claim.

78. **"Tax Collector"** means the Riverside County Treasurer/Tax Collector or its successors-in-interest..

79. **"Unclaimed Distribution"** means any Distribution which is unclaimed as a result of any of the following: (a) checks which have been returned as undeliverable without a proper forwarding address; (b) checks which were not mailed or delivered because of the absence of a proper address to which to mail or deliver the same; (c) checks which remain unnegotiated for a period of ninety (90) days after the date of issuance.

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

80. **"Unclassified Claims"** means the Allowed Amount of (I) all Administrative Claims of the Debtor's Case, allowed pursuant to Section 503(b) of the Bankruptcy Code; and (ii) all Priority Tax Claims entitled to priority pursuant to SECTION507(a)(8) of the Bankruptcy Code.

81. **"Unsecured Creditors"** means Creditors holding Allowed Unsecured Claims against the Debtor for which there are no assets of the Debtor serving as a security, but not including Priority Claims.

82. **"Wage Claimant"** means a Claimant asserting a Claim pursuant to Section 507(a)(3) or (a)(4) of the Bankruptcy Code.

Interpretations, Computation of Time and Governing Law

## 4. **Undefined Terms**

Any term used in the Disclosure Statement that is not defined in the Disclosure Statement, either in Section II.A (Definitions) or elsewhere, but that is used in the Bankruptcy Code or the Bankruptcy Rules has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules.

## 5. **Rules of Interpretation**

For the purposes of the Disclosure Statement:

a. Whenever, from the context, it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural.

b. Any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

shall be substantially in such form or substantially on such terms and conditions.

c. Any reference in the Plan to an existing document or Exhibit Filed or to be Filed means such document or Exhibit, as it may have been or may be amended, modified, or supplemented as of the Confirmation Date.

d. Unless otherwise specified in a particular reference in the Plan, all references in the Plan to Sections, Articles or Exhibits are references to Sections, Articles and Exhibits of or to the Plan.

e. Unless otherwise specified in a particular reference in the Plan, the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan in its entirety rather than only to a particular paragraph, subparagraph, or clause contained in the Plan.

f. Captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.

g. The rules of construction set forth in Bankruptcy Code Section 102 shall apply.

h. The provisions of the Plan will control over any description thereof contained in the Disclosure Statement.

i. Any term used in the Plan that is not defined in the Plan, but that is used in the Bankruptcy Code or in the Bankruptcy Rules shall have the meaning assigned to that term in (and shall be construed in accordance with the rules of construction under) the Bankruptcy Code or the Bankruptcy Rules.

Without limiting the foregoing, the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply hereto. The definitions and rules of construction contained herein do not apply to the Disclosure Statement or to the exhibits to the Plan except to the extent expressly so stated in the Disclosure Statement or in each exhibit to the Plan.

j. Except to the extent that federal law, including the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced for all purposes in accordance with, the laws of the state of Arizona, without giving effect to any principles of conflict of laws thereof. All exhibits to the Plan are incorporated into the Plan and will be deemed to be included in the Plan, regardless of when they are filed.

**6.    Computing Time Periods**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**7.    Section Numbers**

References in the Plan and Disclosure Statement to a Code section are references to the United States Bankruptcy Code (Title 11 of the United States Code) except as otherwise indicated.

**8.    Notices and Delivery of Documents**

All notices, correspondence, and other deliveries under this Disclosure Statement must be directed as follows:

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

| To the Debtor or<br>Reorganized Debtor: | MAMMOTH ARROWHEAD I LLC<br>Attn: Robert Wish<br>29222 Rancho Viejo Road<br>San Juan Capistrano, California |
|---|---|
| With a Copy to: | Thomas C Corcovelos  Esq.<br>CORCOVELOS LAW GROUP<br>1001 Sixth Street, Suite 150<br>Manhattan Beach, California 90266<br>310-374-0116 |

## II.

### BACKGROUND

### A. Description and History of the Debtor's Business

The Debtor, MAMMOTH ARROWHEAD I LLC, (Mammoth) is an Arizona Limited Liability Company that was formed On December 21, 2004 by Robert Wish to acquire the Mammoth Land and develop the site into a class A multi-tenant office and located at 17505 North 79th Avenue, Glendale, Arizona.  There are 2 LLC Members that invested in the Debtor, one of whom consists of an LLC whose members invested their life savings.

Robert Wish and Mammoth Equities as a fiduciary to the LLC members, managing the Mammoth Property, handling all legal issues for the Debtor and attempting through the chapter 11 filing to protect the investment and in some cases the life savings of the LLC members. Neither Robert Wish nor Mammoth Equities own any of

the membership interest in the Debtor.  Robert Wish and Mammoth
Equities are the LLC members fiduciary, managing the Mammoth
Property and handling all legal issues for the Debtor and
attempting through the chapter 11 filing to protect the life
savings of the LLC members.

Prior to 2009, neither Robert Wish nor any of the
partnerships he had formed over his 35 years in the real estate
business had ever filed a chapter 11 and he made concerted
efforts to avoid filing the herein referenced chapter 11 case
as detailed in section II D of this Disclosure Statement. The
Mammoth Land was acquired on January 25, 2005 for $3,450,000,
with construction of The Mammoth Property commencing in December,
2005. Construction of the Mammoth Property was completed in
December, 2006, with the certificate of occupancy being issued on
or about December 28, 2006. The Mammoth Property consists of one
four-story 81,457 sf class A multi tenant office building
consisting of 60 suites divisible down to 2 office suites and is
located in close proximity to a 1.3 million-square-foot regional shopping
center, a major sports arena, and the 101 and 60 freeways. The design and
flexibility of the Mammoth Property is unique and is founded upon
a model formulated by Robert Wish and fine tuned over a 35 year
period of management and development. The Mammoth Property
utilizes a multi-tenant courtyard concept, which offers turnkey
class-A office suites to small businesses. Surrounding a lavish
and lushly landscaped courtyard with water features and tropical
landscape, The Mammoth Property offers small businesses
preconfigured 1-10+ room office suites.  Suites are independently

metered giving tenants individual control of their utilities including HVAC.  The Mammoth Property offers "plug and play" telephone and data allowing tenants to simply move in furniture and begin operations.  Many tenants occupy space the same week the lease is signed.  Larger suites (5-10 rooms) feature additional amenities such as high-end granite reception desks and chrome T-bar ceilings.

Focusing on the needs of tenant, each room within the Mammoth Property has a window and each suite is rough plumbed with water and sewer.  Additionally, the buildings feature high capacity elevators (with emergency battery backup), secured off-hour access, locked restrooms and video monitoring.

The spaces range from 250 to 3,000 square feet with an average suite size of 1,150 square feet.  Suites are move-in ready and finished to be suitable for most small business tenants.  A major contributory factor to the effectiveness of this model is the small tenant niche; 90% of businesses in America are 20 employees or less.  There are only so many ways a small tenant can layout small space.  Over the years, Mammoth Equities has developed proprietary layouts that virtually all general office users with less than 20 employees fit into.  These preconfigured suites have been engineered over the years to maximize efficiency and functionality.

Thirty-five years in the industry have contributed to this proprietary model that Mammoth Equities now employs in ten cities in three states.  The model was specifically designed to minimize Tenant Improvement capital expenditures and maximize

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

profitability.   The buildings function much like an apartment building with shorter leases for "as is" space.   It is not uncommon for stabilized Mammoth buildings to have a waiting list. This model has proven successful over the past several years.

Averaging 2 to 3 year lease terms, the Mammoth Property is geared to a high turnover model.  Small businesses tenants' needs can change drastically in three years.  Accordingly, the short lease term and immediate occupancy provide them critical flexibility with minimal out of pocket expenses (i.e. No TI's) to get up and operational.  Small tenants are less concerned with the "customization" of their spaces due to the shorter lease term.

Each building has 24 hour access with access after 7:00 PM by way of magnetic key that unlocks the front door of each lobby. From a marketing standpoint, the design and flexibility of the Mammoth Property offers great competitive advantage over other new offices in the market area as a potential tenant can designate any number of offices they require and on the same day, obtain occupancy. Other new projects in the market area are not truly competitive as a tenant has to wait weeks or even months to occupy as the offices are in shell condition and must be built out prior to occupancy. Moreover, from a practical standpoint in a recessionary environment where banks and lending institutions are rarely making loans on real estate, an office building that requires no tenant improvement dollars in order for a tenant to sign a lease and occupy space has an overwhelming advantage over other new office buildings that are in a shell condition and that

must seek substantial financing in a highly restrictive lending environment to finish out the space for a tenant. The Mammoth Property is therefore unique in that it requires no additional capital for completion of Tenant Improvements or to remodel its space, in order successfully emerge from chapter 11.

The Manager of MAMMOTH ARROWHEAD I LLC is Mammoth Equities, LLC whose Managing Member is Robert Wish.  Robert Wish has been active in commercial real estate investment and development since 1965 and has been a general partner or manager in several California limited partnerships and limited liability companies. Mr. Wish has constructed numerous projects in addition to acquiring completed projects for the benefit of various entities formed by him. Mr. Wish has purchased approximately fifty existing commercial properties ranging in size from 4,000 to 145,000 square feet and has developed twenty-eight commercial projects ranging in size from 2,400 to 168,000 square feet. These projects include office, strip center retail, mini storage (self-storage) and industrial.  He has also developed over fifteen residential projects ranging in size from a large single family custom home tract to a 496 unit apartment building. Mr. Wish currently controls approximately 1.3 million square feet of commercial real estate in California, Arizona, Nevada and Texas through several operating partnerships some of which are managed by his existing company Foremost Business Parks.

Mr. Wish has over thirty-five years experience in managing multi tenant properties which are occupied by numerous small tenants. Since 2004 Mammoth Equities has leased to more than

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

1,500 small businesses at properties similar in design to the
Mammoth Property.  As outlined above, it is the business
philosophy of Mr. Wish to develop each project with built-out
office suites, thereby affording tenants several options with
which to match their space requirement.  Not only does this
result in immediate occupancies and immediate rental streams, but
when tenants vacate the property, minimal costs are borne by the
landlord to release the space (typically paint and carpet
cleaning only).

The Mammoth Property is managed by Mammoth Equities Property
Management, Inc. who manages a portfolio of 20 similar buildings
at 14 locations with approximately 1.15 million square feet.
Over 95% of the space managed by Mammoth Equities Property
Management is multi-tenant office space similar to that of the
Debtor.  Mammoth Equities Property Management's staff has
extensive knowledge about the unique needs and strategies to
successfully manage Mammoth model properties.
Currently Mammoth Equities Property Management oversees 400+
small business tenants and has executed over 1,500 leases since
2004.  Mammoth Equities Property Management utilizes significant
technological resources to perform management services including
fully integrated Accounting and PM Software, all paperless
database and filing systems, high speed communications including
the Internet and internal networks, fully redundant servers and
personal computers and proven property management and property
performance applications.    Mammoth Equities Property
Management additionally handles all leasing for the properties

and uses Mammoth's proprietary and unique leasing strategy as well as implementing comprehensive marketing and promotion programming.

**B.     Principals/Affiliates of Debtor's Business**

The Debtor, MAMMOTH ARROWHEAD I LLC is made up of 102 Members as listed in section 21 of the schedules.

**C.     Management of the Debtor Before and After the Bankruptcy**

Management of the Debtor before and after the filing of the Bankruptcy is by Mammoth Equities LLC.

**D.     Events Leading to Chapter 11 Filing**

Here is a brief summary of the circumstances that led to the filing of this Chapter 11 case: Robert Wish formed MAMMOTH ARROWHEAD I on December 21, 2004 and raised $3,450,000 by selling 100 membership interests to the 2 equity interest holders for approximately $34,500 per share. The $3,450,000 enabled the Debtor to acquire the Mammoth Land and obtain the construction loan to develop the Mammoth Property.  For the most part, the members of the LLC making up the equity interest holders consist of school teachers, retirees, small company employee pension plans and individuals investing through their IRA accounts. Neither Robert Wish nor Mammoth Equities own any of the membership interest.

After purchasing the Mammoth Land the debtor obtained an $18,585,000 construction loan in December, 2005 and commenced construction of the Mammoth Property the same month, completing construction of the Mammoth Property in December, 2006. Leasing

commenced on the Mammoth Property in January, 2007.

In or about the spring of 2007, Mammoth Arrowhead began discussions and negotiations with Comerica for a refinance of the original construction loan on the Project, which resulted in the closing and funding of a new loan by Comerica to Mammoth Arrowhead on or about June 27, 2007, in the original principal amount of Eighteen Million Five Hundred Eighty-five Thousand and No/100 Dollars ($18,585,000.00)

The funding of the Comerica Bank Loan was approximately 5 months prior to the onset of the recession which began in earnest in November, 2007. Although a project the size of the Mammoth Property typically require an 18 month marketing period to reach 90% occupancy, 5 months after the funding of the Comerica Loan and 11 months after the marketing of the Mammoth Property began, the economy began to slow increasing the estimated time it would take for the project to reach 90% occupancy.

Before the Comerica Loan closed, and as a condition precedent thereto, Comerica commissioned Lefevers Viewpoint Group, Inc. ("Lefevers") to prepare an appraisal report for the Mammoth Property.

On or about May 21, 2007, Lefevers issued an appraisal report for the Mammoth Property (the "1st Appraisal"). Therein, Lefevers identified the Mammoth Property as a "Class A"[1] office project with an "As Is" Market Value of $24,920,000[2]; a "Prospective Market Value Upon Reaching Stabilized Occupancy" of

---

[1] / A "Class A" building is characterized by superior location and access; high-quality construction materials and condition, and professional management.
[2] / the Mammoth Property's Market Value at this point was equal to its completed value at 0% occupancy.

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

1  $26,380,000; and, an insurable value of $10,970,000.

2  The 1st Appraisal utilized an income approach to determine

3  the value of the Mammoth Property.  As such, Lefevers'

4  determination that the Mammoth Property was a "Class A" office

5  project had a substantial effect on the Market Value of the

6  Mammoth Property.  Specifically, rental rates for "Class A"

7  buildings in the area where the Mammoth Property is located are

8  as much as twenty-six percent (26%) higher than "Class B"

9  buildings.  The higher rental rates associated with the "Class A"

10  designation supported the $26,380,000, "Prospective Market Value

11  Upon Reaching Stabilized Occupancy" Market Value of the Mammoth

12  Property.

13  The Comerica Loan required that Mammoth Arrowhead maintain a

14  Loan-to-Value Ratio of no more than seventy percent (70%).  As

15  such, and based upon the "Prospective Market Value Upon Reaching

16  Stabilized Occupancy" of $26,380,000, Comerica qualified Mammoth

17  Arrowhead for $18,585,000.[1]  The Comerica Loan proceeds,

18  excepting $4,085,000 in "Holdback Funds" (as defined in paragraph

19  1.10 of the Comerica Loan Agreement), were initially disbursed in

20  July, 2007.

21  In or about February, 2008, Mammoth Arrowhead and Comerica

22  entered into a Loan Modification Agreement (the "Modification").

23  Pursuant to the Modification, the "Holdback Funds" were reduced

24  by $3,085,000, and the remaining $1,000,000 was reallocated and

25  set aside as an interest reserve[2].  As a result of the

26

27  ─────────────

28  [1]/ Not all of the $18,585,000 was immediately disbursed or
available to Mammoth Arrowhead.
[2]/ All original loan documents were updated, ratified, and

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

1  Modification, the outstanding principal balance on Loan was

2  reduced to $15,500,000.

3      In or about August 2008, Comerica commissioned Lefevers to

4  prepare an annual appraisal report for the Building.  Mammoth

5  Arrowhead worked with Lefevers to provide it with the information

6  required to complete the appraisal.

7      Lefevers issued the second appraisal on September 8, 2008

8  (the "2nd Appraisal").  In contrast to the 1st Appraisal (which

9  was completed just 16 months prior), the 2nd Appraisal classified

10  the Mammoth Property as a "Class B" office project[1].

11     The reclassification of the Mammoth Property as a "Class B"

12  office project had a substantial impact upon the appraised value

13  of the Mammoth Property.  Specifically, the Mammoth Property's

14  "As Is" Market Value was reduced approximately 26%, to

15  $18,830,000; and, its "Prospective Market Value Upon Reaching

16  Stabilized Occupancy" was reduced approximately 25% to

17  $19,840,000.  Surprisingly, however, the 2nd Appraisal *increased*

18  the insurable value of the Mammoth Property approximately 12% to

19  $12,260,000.

20     As a direct result of the 2nd Appraisal, the Loan-to-Value

21  Ratio on the Comerica Loan jumped from 70% to 78%, and Comerica

22  demanded that Mammoth Arrowhead make a principal reduction

23  payment in the amount of $1,612,000 to reduce the Loan-to-Value

24  Ratio to 70%.

25

26

27  reaffirmed by the parties to the Loan and the Modification.
   [1]/ A "Class B" building is characterized by a good location,
28  management, and construction, but may suffer some physical
   deterioration or functional obsolescence.

1    In response to 2nd Appraisal (specifically the

2   reclassification of the Mammoth Property), Mammoth Arrowhead

3   commissioned an independent MAI appraisal through Michael

4   Frauenthal & Associates, of Dana Point, California ("MFA").  MFA

5   issued an independent appraisal of the Mammoth Property on

6   October 6, 2008 (the "Independent Appraisal").

7    The Independent Appraisal identified the Mammoth Property as

8   a "Class A" office project with an "As Is" Market Value of

9   $19,250,000; and a "Prospective Market Value upon Reaching

10   Stabilized Occupancy" of $20,770,000.

11    Despite the ongoing disagreement between the parties about the Fair Market

12   Value of the Building, on or about October 23, 2008, Mammoth Arrowhead made a

13   principal reduction payment toward the Comerica Loan.  At that time, however, it

14   specifically reserved its right to challenge the 2nd Appraisal.

15    In or about May, June, and July 2009, and pursuant to the terms of the Comerica

16   Loan Agreement, Mammoth Arrowhead made multiple requests to extend the maturity

17   date of the Comerica Loan.  Comerica, however, failed and/or refused to grant the

18   request.

19

20    On or about July 31, 2009, Comerica sent Plaintiffs a Notice to Borrower and

21   Guarantors of: (1) Loan Maturity; (2) Demand for Payment in Full; and (3) Imminent

22   Legal Action ("Notice of Maturity").  Therein, Comerica alleged the Plaintiffs had

23   defaulted on the Comerica Loan Agreement because, despite Mammoth Arrowhead's

24   requests to extend the maturity date of the Comerica Loan, they did not make payment

25   in full on or before the maturity date.

26    Despite the Notice of Maturity and the threat of "Imminent Legal Action", in or

27   about August 2009 through November, 2009 at which time the debtor determined

28   Comerica would not extend the maturity date of the Comerica Loan.

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

Based upon Robert Wish's experience in the previous recession, the Debtor determined that the Mammoth Property would indeed lease up and that the value of the Mammoth Property would increase substantially once the recession ended; therefore, the Debtor refused to allow Comerica Bank to foreclose on the Mammoth Property and determined that a chapter 11 filing would enable the Debtor to pay all creditors in full as well as protect in many instances, the life savings of the LLC members.

Although prior to 2009, neither Robert Wish nor any of the partnerships he had formed over his 35 years in the real estate business had ever filed a chapter 11 and even though he made concerted efforts to avoid filing the herein referenced chapter 11 case, facing a pending foreclosure and unable to renegotiate the terms of the Comerica Bank Note, the Debtor filed for protection under Chapter 11 of the Federal Bankruptcy code on November 12, 2009.

**E.    Significant Events During the Bankruptcy**

    **1.Bankruptcy Proceedings**

The following is a chronological list of significant events which have occurred <u>during</u> this case:

On or about November 12, 2009, the Debtors' filed its chapter 11 case.

The Court has approved the employment of the following professionals:  Thomas C Corcovelos as Counsel for the Debtor.

On December 10, 2009, the following significant adversary proceeding was filed:    **MAMMOTH ARROWHEAD I, LLC,** an Arizona limited

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

Corcovelos Law Group

Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

1  liability company, **MAMMOTH EQUITIES, LLC,** a Nevada limited liability company,

2  **ROBERT L. WISH,** and  **CAROL LECHIARA**, Trustee of the **RAYVERCAR**

3  **INTERNATIONAL TRUST, COMERICA BANK,** a California corporation; and **DOES** 1

4  through 20, inclusive,

5  removed to Bankruptcy court On December 10, 2009 as case No.

6  6:09-ap-01713.*  The case was previously pending in Riverside

7  Superior Court Case No. 30-2009-00305211.  The Adversary

8  Proceeding was closed on December 16, 2009.

9        On December 29, 2009, a Motion to Change Venue to the

10  District of Arizona was filed and subsequently heard and on

11  January 2009.  The Motion to Change Venue to the District of

12  Arizona was approved on February 4, 2010.

13  **2.    Other Legal Proceedings**

14        In addition to the proceedings discussed above, the Debtor

15  is currently involved in the following non-Bankruptcy legal

16  proceedings:

17        A       On or about July 31, 2009, Comerica sent the Debtor a Notice to

18  Borrower and Guarantors of: (1) Loan Maturity; (2) Demand for Payment in Full; and (3)

19  Imminent Legal Action ("Notice of Maturity").

20        B    On September 17, 2009 the Debtor filed a lawsuit in

21  California Superior Court: **MAMMOTH ARROWHEAD I, LLC,** an Arizona

22  limited liability company, **MAMMOTH EQUITIES, LLC,** a Nevada limited liability

23  company, **ROBERT L. WISH,** and  **CAROL LECHIARA**, Trustee of the **RAYVERCAR**

24  **INTERNATIONAL TRUST, COMERICA BANK,** a California corporation; and **DOES** 1

25  through 20, inclusive. The lawsuit seeks Declaratory Relief alleging Breach of

26  Contract, and Breach of Implied Covenant of Good Faith and Fair Dealing.

27        **3.    Actual and Projected Recovery of Preferential or**

28

**Fraudulent Transfers**

Nothing is estimated to be realized from the recovery of fraudulent and preferential transfers.  The following is a summary of the fraudulent conveyance and preference actions filed or to be filed in this case:  The Debtor does not expect, at this time, to file any fraudulent conveyance or preference actions in this case.

### 4. Procedures Implemented to Resolve Financial Problems

The Debtor has implemented the following procedures as part of its strategy to successfully lease the Mammoth Property:  The Debtor has increased its advertising budget, initiated an incentive program offering free telephone service in exchange for tenants signing a long term lease, and has increased its outreach to the real estate brokerage community.

### 5. Current and Historical Financial Conditions

The Debtor's debt service obligations were historically paid through the interest reserve initially and then through the cash flow resultant for the leases on the mammoth Property. The Debtor's current operations are able to meet its debt service obligations on Mammoth Property and have been able to do so for over one year. The debtor projects that through the term of the chapter 11 case and through the term of the plan, there will be revenues sufficient to make the full mortgage payments.

The identity and fair market value of the estate's assets are listed in Exhibit A.

### III.

### SUMMARY OF THE PLAN OF REORGANIZATION

**A. What Creditors and Interest Holders Will Receive Under The Proposed Plan**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority.  The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class will receive.

**B.   Unclassified Claims**

Certain types of claims are not placed into voting classes; instead they are unclassified.  They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Proponent has <u>not</u> placed the following claims in a class.

**1.    Administrative Expenses**

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Code section 507(a)(1).  The Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists <u>all</u> of the Debtor's § 507(a)(1) administrative claims and their treatment under the Plan.

| Name | Amount Owed | Treatment |
|------|-------------|-----------|
| Thomas C Corcovelos | $1,000 | Paid on Effective Date |
|  |  |  |

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

| | | |
|---|---|---|
| | | |
| Clerk's Office Fees | $250 (estimated) | Paid in full on Effective Date |
| Office of the U.S. Trustee Fees | $500 (4th 1/4 ' 96) | Paid in full on Effective Date |
| | TOTAL $1,750.00 | |

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

Court Approval of Fees Required:

The Court must rule on all fees listed in this chart before the fees will be owed.  For all fees except Clerk's Office fees and U.S. Trustee's fees, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application.  Only the amount of fees allowed by the Court will be owed and required to be paid under this Plan.

As indicated above, the Debtor will need to pay $1,750.00 worth of administrative claims on the Effective Date of the Plan unless the claimant has agreed to be paid later or the Court has not yet ruled on the claim.  As indicated elsewhere in this Disclosure Statement, Debtor will have approximately $100,000 in cash on hand on the Effective Date of the Plan.  The source of this cash will be lease revenue.

### 2.    Priority Tax Claims

Priority tax claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8).  Except to the extent that the holder of a particular Allowed Priority Tax Claim agrees to a different treatment thereof, the Code requires

that each holder of an Allowed Priority Tax Claim receive the present value of such Allowed Priority Tax Claim in deferred Cash payments over a period not exceeding six years from the date of assessment of such tax.

Treatment of Allowed Priority Tax Claims. The Debtor's Plan provides that deferred Cash payments will be paid in equal annual installments of principal and interest and will be in an amount sufficient to amortize each Allowed Priority Tax Claim fully over a period of six years from the Effective Date. The outstanding and principal amount of each Allowed Priority Tax Claim will bear interest, commencing on the Effective Date and continuing until such Allowed Priority Tax Claim is paid in full, at the lesser of: (i) the rate of six percent (6%) per annum; or (ii) the rate specified by Section 6621(a) of the Internal Revenue Code, as such rate is adjusted from time to time. Payments to holders of Allowed Priority Tax Claims will commence on the first anniversary of the Effective Date and will continue on each annual anniversary of the Effective Date.

The Reorganized Debtor will have the right to pay all Allowed Priority Tax Claims, or any remaining balance of such Claim, in full, at any time on or after the Effective Date, without premium or penalty. The following chart lists all of Debtor's Section 507(a)(8) priority tax claims and their treatment under the Plan: **The Debtor has no Section 507(a)(8) priority tax claims.** [1]

---

[1]     In the event any taxing agencies filed Priority Tax Claims, the Debtor reserves the right to file an objection to such Claims on any appropriate grounds.

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

The following chart lists <u>all</u> of the Debtor's Section 507(a)(8) priority tax claims and their treatment under the Plan:

| Description | Amount Owed | Treatment |
|---|---|---|
| | | |
| · Name = Not Applicable<br><br>· Type of tax = None<br><br>· Date tax assessed = Not Applicable | 0.00 | · Pymt interval          =<br>· Est. pymt amt/interval  =<br>· Begin date             =<br>· End date               =<br>· Interest rate %        =<br>· Total payout amount%    = $ |

## C.    Classified Claims and Interests

### 1.    Classes of Secured Claims

Secured claims are claims secured by liens on property of the estate.  The following chart lists all classes containing Debtor's secured pre-petition claims and their treatment under the Plan.

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

1
2
3
4
5
6  ////
7  ////
8  ////
9

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|--------|-------------|----------------|----------------|-----------|

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

| 1 | Secured claim of: | N | Impaired, Claims in this class are entitled to vote on the Plan. | · Pymt interval  = Monthly |
|---|---|---|---|---|
| | · Name =Comerica Bank | | | · Est. pymt amt/interval = $45,208 |
| | · Collateral description = 1st Trust Deed | | | · Balloon pymt = $15,500,000 |
| | · Collateral value = $19,250,000 | | | · Begin date = 11/20/10 |
| | · Priority of security int. = 1st | | | · End date = 11/19/2015 |
| | · Principal owed = $15,500,000 | | | · Interest rate % = Comerica Bank Base LIBOR which Base LIBOR rate is estimated at 3.5% on Effective Date. |
| | · Pre-pet. Arrearage 0 | | | · Total payout % = 100% |
| | · Post-pet. arrearage amount = o (est) | | | $18,212,500 will be paid over 60 months at $45,208 per month on 100% of a principal balance of $15,500,000. |
| | · Total claim amount = $15,500,000 | | | |
| | | | | · Treatment of lien = Lien is retained and in full force and effect. |

Comments:

Class 1 consists of the Allowed Claims of COMERICA BANK or the holder of the COMERICA BANK NOTE.  Class 1 is impaired under the Plan.  As of the confirmation date, the COMERICA BANK NOTE shall be deemed satisfied and paid in full.  Within five (5) business days after the Confirmation Date (but coterminous with the execution and delivery of the COMERICA BANK FIRST NOTE as described below), COMERICA BANK or the holder of the COMERICA BANK NOTE shall return to the Reorganized Debtor the COMERICA

Corcovelos Law Group

Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

BANK NOTE marked "Paid in Full."  Comerica Bank or the holder of

the COMERICA BANK Security Documents shall also return to the

Reorganized Debtor the Comerica Bank Security Documents marked

"Canceled" and "Superseded."  In full and complete satisfaction

of the Allowed Class 1 Claim, COMERICA BANK or the holder of the

Allowed Class 1 Claim shall receive the following:

(I)    Within five (5) business days after the Confirmation

Date (but coterminous with the cancellation and return of the

COMERICA BANK NOTE as described above), the Reorganized Debtor

shall execute the COMERICA BANK FIRST NOTE and the Amended

U.S.BANK Security Documents.

(a)    The COMERICA BANK FIRST NOTE

The COMERICA BANK FIRST NOTE and Amended Comerica Bank

Security Documents shall be in the same form as the COMERICA BANK

FIRST NOTE and COMERICA BANK NOTE Security Documents,

respectively.

In the event there is any provision of the COMERICA BANK

FIRST NOTE which is inconsistent with the terms of the Plan, the

terms of the Plan shall control.

The Amended Comerica Bank Security Documents shall secure a

lien on the Mammoth Property with the same priority and validity

that existed prior to the Debtor's alleged pre-petition

default(s).  The Amended Comerica Bank Security Documents shall

secure repayment of the COMERICA BANK FIRST NOTE.  Since the

COMERICA BANK NOTE has been paid in full pursuant to the Plan,

any event of default that may have existed pre-petition with

respect to the COMERICA BANK NOTE and/or the Comerica Bank

Security Documents shall be deemed cured and any notice of default which may have been recorded pre or post-petition with respect to the COMERICA BANK NOTE and the Comerica Bank Security Documents shall be deemed null and void and of no further force or effect, and COMERICA BANK or the holder of the COMERICA BANK NOTE shall execute any documents or instruments necessary to reflect the same, including the execution and recordation of a release of notice of default.

Payments on the COMERICA BANK FIRST NOTE shall be made in monthly installments, based upon the interest rate index and margin that are identical to the pre-petition interest rate and margin on the COMERICA BANK NOTE. The monthly payments shall be calculated with reference to a variable annual rate of interest equal to the "Base LIBOR" as defined in the original "Addendum to the Comerica Bank Note" dated June 27, 2007 and shall be interest only. The first (1st) payment shall be due on the fifteenth (15th) day of the first (1st) full month following the Effective Date, and shall be in an amount equal to a percentage of a full monthly installment payment derived from the number of days remaining in the month in which the Effective Date occurs (the numerator) divided by the number of days in the month in which the Effective Date occurs (the denominator).  Thereafter, payments shall be due on the fifteenth (15th) day of each and every month until the sixtieth (60th) month after the Effective Date at which time the entire outstanding balance of the COMERICA BANK FIRST NOTE shall be all due and payable.  Upon payment in full of the COMERICA BANK FIRST NOTE, the lien evidenced by the

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

Amended Comerica Bank Security Documents shall be deemed satisfied and shall be deemed canceled.

The Guarantees signed by the Debtor, Robert Wish, Mammoth Equities and Debtor affiliates shall not be enforced post petition as long as post petition payments are made on the Comerica First Note excepting that any differential between the contract interest rate payments on the Comerica  Note and the interest rate payments on the Comerica First Note that results in a lesser interest payment to Comerica will not affect Comerica Banks' rights to enforce the guarantees to make up the difference between the interest payments.

In the event that the Reorganized Debtor defaults in its obligation to pay each payment due and payable under the COMERICA BANK FIRST NOTE and the Amended U.S.BANK Security Documents, the holder of the COMERICA BANK FIRST NOTE shall be entitled to record a notice of default and accelerate the entire unpaid indebtedness and/or exercise such other remedies as provided under the COMERICA BANK FIRST NOTE and the Amended Comerica Bank Security Documents or under applicable California law.  The Reorganized Debtor shall be entitled to cure and reinstate any such default under applicable California law.

Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 1 claim to seek recovery on its claim as against any party other than the Reorganized Debtor.



| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|--------|-------------|----------------|----------------|-----------|
|        |             |                |                |           |

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

| 2 | Secured claim of: | N | Impaired, | · Pymt interval  = Monthly |
| | · Name = Rotsheck | | Claims in | · Est. pymt amt/interval = $65 |
| | Construction | | this class | · Balloon pymt  $0 |
| | · Collateral | | are | . Begin date = 11/20/10 |
| | description = | | entitled | · End date = 11/19/2015 |
| | Mechanics Lien | | to vote on | · Interest rate % = 3 |
| | · Collateral value = | | the Plan. | · Total payout % = $3,876 |
| | $19,250,000* | | | will be paid over 60 months at |
| | · Priority of | | | $65 per month on 100% of a |
| | security int. recorded | | | principal balance of $3,550. |
| | mechanics lien | | | · Treatment of lien = Lien is |
| | · Principal owed = | | | converted to a deed of trust |
| | $3,550 | | | in the same priority position |
| | · Pre-pet. arrearage | | | as the pre-petition Rotsheck |
| | amount = $ (included | | | Construction mechanics Lien. |
| | above) | | | |
| | · Post-pet. arrearage | | | |
| | amount = N/A | | | |
| | · Total claim amount = | | | |
| | $3,550 | | | |

Comments:

    Class 2 consists of the Allowed Claim of Rotsheck

Construction or the holder of the Rotsheck Construction Mechanics

Lien.  Class 2 is impaired under the Plan.  As of the

confirmation date, in full and complete satisfaction of the
Allowed Class 2 Claim, Rotsheck Construction or the holder of the
Allowed Class 2 Claim shall receive the following:

(I)    Within five (5) business days after the Confirmation
Date, (but coterminous with the cancellation and removal of the
Rotsheck Construction Mechanics Lien), the Reorganized Debtor
shall execute the Rotsheck Construction Note and the Rotsheck
Construction Note Security Documents.

The Rotsheck Construction Note shall secure a lien on the
Mammoth Property with the same priority that existed for Rotsheck
Construction on the petition date. The Rotsheck Construction Note
shall secure repayment of the Rotsheck Construction Mechanics
Lien.  Rotsheck Construction or the holder of the Class 2 Claim
shall execute any documents or instruments necessary to release
the Mechanics lien, including the execution and recordation of a
release of Mechanics Lien.

Payments on the Rotsheck Construction Note shall be made in
monthly installments of principal and interest, with interest
calculated with reference to a fixed annual rate of interest of
three percent (3%) amortized over 84 months.  Interest shall
begin to accrue on the Rotsheck Construction Note as of the
Effective Date.  The first (1st) payment shall be due on the
fifteenth (15th) day of the first (1st) full month following the
Effective Date, and shall be in an amount equal to a percentage
of a full monthly installment payment derived from the number of
days remaining in the month in which the Effective Date occurs
(the numerator) divided by the number of days in the month in

which the Effective Date occurs (the denominator).  Thereafter,
payments shall be due on the fifteenth (15th) day of each and
every month until the twenty-fourth (24th) month after the
Effective Date at which time the entire outstanding balance of
the Rotsheck Construction Note shall be all due and payable.
Upon payment in full of the Rotsheck Construction Note, the lien
evidenced by the Rotsheck Construction Note shall be deemed
satisfied and shall be deemed canceled.

In the event that the Reorganized Debtor defaults in its
obligation to pay each payment due and payable under the Rotsheck
Construction Note and the Rotsheck Construction Note Security
Documents, the holder of the Rotsheck Construction Note shall be
entitled to record a notice of default and accelerate the entire
unpaid indebtedness and/or exercise such other remedies as
provided under the Rotsheck Construction Note and Rotsheck
Construction Note Security Documents or under applicable
California law.  The Reorganized Debtor shall be entitled to cure
and reinstate any such default under applicable California law.

Nothing in the Plan shall enhance or otherwise increase the
rights of the holder of the Class 2 claim to seek recovery on its
claim as against any party other than the Reorganized Debtor.

### 2. Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Code
Sections 507(a)(3), (4), (5), (6), and (7) are required to be
placed in classes.  These types of claims are entitled to
priority treatment as follows: the Code requires that each holder
of such a Claim receive cash on the Effective Date equal to the

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

1  allowed amount of such Claim.   However, a Class of unsecured

2  priority claim holders may vote to accept deferred cash payments

3  of a value, as of the Effective Date, equal to the allowed amount

4  of such Claim. **The Debtor has no Claims of the type identified in**

5  **Code Sections 507(a)(3), (4), (5), (6), and (7).**

6       **3. Classes of General Unsecured Claims**

7       General unsecured claims are unsecured claims not entitled

8  to priority under Code Section 507(a).

9       The following chart identifies the Plan's treatment of the

10  classes containing all of Debtor's General Unsecured Claims:[1]

17  ////

18  ////

19  ////

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
|         |             |                |           |

---

[1]    The Debtor reserves its right to object to any of the Claims filed by
the following Creditors on any reasonable grounds.

| 3 | General unsecured claims<br><br>· Total amt of claims = $22,581.71 | y<br><br>Impaired non-insider claims in this class are entitled to vote on the plan | Pymt interval = Monthly<br>· Est. pymt amt/interval = $66<br>· Balloon pymt = $22,581.71<br>· Begin date = 11/20/2010<br>· End date = 11/19/2015<br>· Interest rate % = 3%<br>· Total payout = $25,969 at 66 per month on 100% of a principal balance of $22,581.71 or Class 3 Claimants may elect to receive 50% of their claim on the 13th 12 months following the Effective Date as payment in full.<br>· Treatment of lien = Lien is converted to a promissory note. |

Class 3 consists of the Allowed Claims of the General Unsecured Creditors.   Class 3 is impaired under the Plan. In full and complete satisfaction of the Class 3 Claim, the Class 3 Claimant shall be treated as follows: On or before the Effective Date, the Debtor shall execute a promissory note with each holder of a Class 3 Claim.  The Note will provide that, commencing on the First full month following the Effective Date of the Plan, the obligations evidenced by the promissory note will accrue interest at the rate of three percent (3%).  Commencing on the fifteenth (15th) day of each month thereafter through the Sixtieth (60th) following the Effective Date, the Reorganized Debtor shall make equal monthly payments of interest to the Class 3 Claimant.  The Promissory Note shall be due and payable eighty four (84) months following the Effective Date, excepting that the

Class 3 Claimants may elect to receive a one time lump sum payment equal to fifty percent (50%) of their allowed claim as payment in full on the 13th month following the Effective Date. In the event of a sale of the Mammoth Property the Class 3 Claimants Claims shall be payable at close of escrow.  In the event funds are not sufficient to pay the Class 3 Claimants upon sale of the Mammoth Property, the Class 3 Claimants shall receive a pro-rata share of the funds available by dividing the total amount of money each Class 3 Claimant is owed by the sum of the Class 3 Claimants claim and multiplying that percentage by the amount of money available to pay the Class 3 Claimants after sale of the Mammoth Property.

Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 3 claim to seek recovery on its claim as against any party other than the Reorganized Debtor.

### 4. Classes of Interest Holders

Interest holders are the parties who hold ownership interest (i.e., equity interest) in the debtor.  If the debtor is a corporation, entities holding preferred or common stock in the debtor are the interest holders.  If the debtor is a partnership, the interest holders include both general and limited partners. If the debtor is an individual, the debtor is the interest holder.  The following chart identifies the Plan's treatment of the class of interest holders.

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| | | | |

| 4 | Interest holders<br><br>There are 2 interest holders whose names and percentage interest are listed in Exhibit F | Insider; claims in this class are not entitled to vote on the Plan | Class 4 is unimpaired under the Plan and will receive the pro-rata share of monies available after payment to classes 1,2,3,4 and 5 |
|---|---|---|---|

**Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of any Disputed Claim or Disputed Interest until such Claim or Interest becomes an Allowed Claim or Allowed Interest, and then only to the extent it becomes an Allowed Claim or Allowed Interest. Any Proof of Claim or Proof of Interest filed which differs from the Scheduled amount is deemed to be a Disputed Claim or Disputed Interest.**

9. **Resolution of the State Court Actions**

The Debtor has removed its state court action MAMMOTH ARROWHEAD I , a Nevada Limited Liability Company; MAMMOTH EQUITIES, LLC, a Nevada limited liability company; vs. Comerica Bank, A California Corporation ; and DOES 1 through 100, inclusive, "case No. 30-2009-00305211 to the federal bankruptcy court, case No. 6:09-ap-01713. The Debtor intends to seek damages of $13,000,000 in the adversary proceeding and any recovery under the adversary proceeding will be utilized to pay the Class 1, 2, and 3 creditors.

**D.    Means of Effectuating the Plan**

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

## 1.    Funding for the Plan

The Plan will be funded by the following:  The Reorganized Debtor shall make all payments due under the Plan out of the funds on hand in the Debtor's Estate as of the Effective Date, through the Net Operating Income generated by the lease revenue and or the eventual sale or refinance of the Mammoth Property. The Debtor believes that Mammoth Property will generate lease revenue sufficient to make the monthly payments required under the plan.

## 2.    Post-Confirmation Management

Mammoth Equities Property Management Group who is the current property manager will be retained as post-confirmation management.  Its duties will include supervision of the on-site manager, contracting with contractors and repairmen for maintenance and repairs, prosecuting unlawful detainer actions and attempting to collect rents from those tenants who do not pay the on-site manager, paying bills, and maintaining books and records for the property.

## 3.    Disbursing Agent

The Debtor shall act as the Disbursing Agent for the purpose of making all distributions provided for under the Plan.  The Disbursing Agent shall serve <u>without</u> bond and shall receive compensation equal to 1% of the gross sales price of the Mammoth Property for distribution services rendered and expenses incurred pursuant to the Plan.

## E.    Risk Factors

The proposed Plan has the following risks  which could

adversely impact the Debtor's ability to make Plan payments: (1) there is a possibility of default, i.e., possibility of inability to pay Plan payments, (2) the financial projections provided by the Plan Proponent may not be realized, (3) the business environment and rental market may decline from its present level, (4) competition with the Debtor in the rental market may increase, (5) the legal environment in terms of laws and regulations could change and have a negative impact upon the Debtor, (6) the reorganized Debtor could be sued and the costs and expenses of litigation could impact the Debtor's financial circumstances.

**F.   Other Provisions of the Plan**

    **1.   Executory Contracts and Unexpired Leases**

        **a.   Assumptions**

The following are the unexpired leases and executory contracts to be assumed as obligations of the reorganized Debtor under this Plan (see Exhibit D for more detailed information on unexpired leases and executory contracts to be assumed):

No leases shall be assumed.

The Reorganized Debtor shall assume the "Mammoth Equities Property Management Group" property management contract in accordance with the provisions as set forth in the existing contract.

On the Effective Date, the unexpired leases referenced above (if any) and the executory contract referenced above shall be assumed as obligations of the reorganized Debtor.  The Order of the Court confirming the Plan shall constitute an Order approving

Corcovelos Law Group

Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

the assumption of the lease and executor contract listed above. If you are a party to a lease or contract to be assumed and you object to the assumption of your lease or contract, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.  See Section {I.B.3.} of this document for the specific date.

**b.    Rejections**

On the Effective Date, the following executory contracts and unexpired leases will be rejected:  None

The Order Confirming the Plan shall constitute an Order approving the rejection of the lease or contract.  If you are a party to a contract or lease to be rejected and you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.  See Section {I.B.3.} of this document for the specific date.

THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT IS - not applicable.  Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court later orders otherwise.

**2.    Changes in Rates Subject To Regulatory Commission Approval**

This Debtor is not subject to governmental regulatory commission approval of its rates.

**3.    Retention of Jurisdiction**

The Court will retain jurisdiction to the extent provided by

law.

**G.    Tax Consequences of Plan**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the Debtor.  The Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

The following are the tax consequences which the Plan will have on the Debtor's tax liability:

The Debtor does not believe that confirmation or consummation of the Debtor's Plan will have any tax consequences to the Debtor.

Creditors and interest holders are advised to consult with their own tax advisors respecting the tax consequences, if any, of the Plan, including state and local tax consequences.

**IV.**

**CONFIRMATION REQUIREMENTS AND PROCEDURES**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims.

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

The Proponent CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan.  Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible.  These requirements are <u>not</u> the only requirements for confirmation.

**A.    Who May Vote or Object**

**1.    Who May Object to Confirmation of the Plan**

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

**2.    Who May Vote to Accept/Reject the Plan**

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

**a.    What Is an Allowed Claim/Interest**

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim.  When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

objection or allows the claim or interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE IS

A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed.  A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.  An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest. Consult Exhibits F through L to see how the Proponent has characterized your claim or interest.

**b.    What Is an Impaired Claim/Interest**

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is <u>impaired</u> under the Plan.  A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

<u>In this case, the Proponent believes that classes 1, 2, 3, 4 and Class 3 Claimants are non-insider classes that are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan.</u>  The Proponent believes that there are <u>no classes that</u> are unimpaired. Holders of claims in unimpaired classes do not have the right to vote to accept or reject the Plan.  Parties who dispute the Proponent's characterization of their claim or interest as being impaired or

1  unimpaired may file an objection to the Plan contending that the

2  Proponent has incorrectly characterized the class.

### 3.   Who Is Not Entitled to Vote

4      The following four types of claims are not entitled to vote:

5  (1) claims that have been disallowed; (2) claims in unimpaired

6  classes; (3) claims entitled to priority pursuant to Code

7  sections 507(a)(1), (a)(2), and (a)(8); and (4) claims in classes

8  that do not receive or retain any value under the Plan.  Claims

9  in unimpaired classes are not entitled to vote because such

10  classes are deemed to have accepted the Plan.  Claims entitled to

11  priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(7)

12  are not entitled to vote because such claims are not placed in

13  classes and they are required to receive certain treatment

14  specified by the Code.  Claims in classes that do not receive or

15  retain any value under the Plan do not vote because such classes

16  are deemed to have rejected the Plan.  EVEN IF YOUR CLAIM IS OF

17  THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO

18  THE CONFIRMATION OF THE PLAN.

### 4.   Who Can Vote in More Than One Class

21      A creditor whose claim has been allowed in part as a secured

22  claim and in part as an unsecured claim is entitled to accept or

23  reject a Plan in both capacities by casting one ballot for the

24  secured part of the claim and another ballot for the unsecured

25  claim.

### 5.   Votes Necessary to Confirm the Plan

27      If impaired classes exist, the Court cannot confirm the Plan

28  unless (1) at least one impaired class has accepted the Plan

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed later in Section {IV.A.8.}.

### 6.    Votes Necessary for a Class to Accept the Plan

**C.**    Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if: (a) the holders of at least two-thirds (2/3) in dollar amount of the Allowed Claims actually voting in such Class (other than Claims held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have timely and properly voted to accept the Plan, and (b) more than one-half (1/2) in number of the holders of such Allowed Claims actually voting in such Class (other than Claims by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have timely and properly voted to accept the Plan.

**D.**    No Class of Interests is entitled to vote on the Plan pursuant to section 1126(f) of the Bankruptcy Code.

### 7.    Treatment of Nonaccepting Classes

As noted above even if <u>all</u> impaired classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Code.  The process by which nonaccepting classes are forced to be bound by the terms of a Plan is commonly referred to as "cramdown."  The Code allows the Plan to be "crammed down" on nonaccepting classes of claims or interests if it meets all consensual requirements except the voting requirements of

Corcovelos Law Group

Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

**8.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)**

The party proposing this Plan <u>will</u> ask <u>the Court</u> to confirm this Plan by cramdown on impaired classes <u>1, 2, 3 and 4</u> if any of these classes do not vote to accept the Plan.

**B.    Liquidation Analysis**

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis.  Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee.  Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien.  Administrative claims are paid next.  Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims.  Finally, interest holders receive the balance that remains after

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

Corcovelos Law Group

Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

1  all creditors are paid, if any. For the Court to be able to

2  confirm this Plan, the Court must find that all creditors and

3  interest holders who do not accept the Plan will receive at least

4  as much under the Plan as such holders would receive under

5  Chapter 7 liquidation.  The Plan Proponent maintains that this

6  requirement is met here for the following reasons:  The Debtor's

7  primary asset is the Mammoth Property, along with the Mammoth

8  Adversary Action against Comerica Bank.  The Mammoth Property is

9  encumbered by a first-priority lien in favor of Comerica Bank,

10  the holder of the COMERICA BANK NOTE.  The balance of the

11  COMERICA BANK NOTE as of the Petition Date was approximately

12  $15,500,000. Based upon the Debtor's estimate, the liquidated

13  value of Mammoth Property is 14,437,500. Assuming that in a

14  Chapter 7 proceeding, the liquidation value could be obtained,

15  and further assuming that there would be normal costs of sale and

16  other costs of administration attendant to the Chapter 7

17  proceeding, there would not be sufficient proceeds generated by a

18  sale of the Property to even pay the COMERICA BANK NOTE.  The

19  conclusion that necessarily follows is that Unsecured Creditors

20  of the Debtor's Estate would not receive any distribution were

21  this Chapter 11 proceeding converted to one under Chapter 7 of

22  the Code.  The plan, which provides for a distribution to

23  Unsecured Creditors, clearly provides a greater return to

24  Unsecured Creditors than that which would be achieved in a

25  Chapter 7.  Consequently, the Debtor believe that the Plan, as

26  proposed, provides to Unsecured Creditors more than they would

27  receive were the Debtor's Case converted to one under chapter 7

of the Code. The Plan proposes to pay general unsecured creditors approximately 100% of their total claims while a liquidation of the Debtor's estate would result in a 0% dividend.  In a Chapter 7 case, a trustee is appointed and entitled to compensation from the Bankruptcy estate in an amount not to exceed 25% on the first $5,000 of moneys disbursed, 10% on any amount over $5,000 but less than $50,000, 5% on any amount over $50,000 but not in excess of $1 million and 3% on all amounts over $1 million.  In this case, the trustee's compensation is estimated to equal $467,625 based upon a liquidated value of the Mammoth Property of 14,437,500 which is equal to 75% of the fair market value of the Property.  Through the Plan however, no trustee's compensation will be incurred.

Below is a demonstration, in balance sheet format, that all creditors and interest holders will receive at least as much under the Plan as such creditor or interest holder would receive under Chapter 7 liquidation. (See Exhibit A for a detailed explanation of how the following assets are valued.  This information is provided by the Debtor.)  For purposes of the liquidation analysis, the state court action has been given a zero value as it is unlikely a chapter 7 trustee would fund the litigation.

**ASSETS VALUED AT LIQUIDATION VALUES**

| ASSETS AT LIQUIDATION VALUE | LIQUIDATION VALUE | DEBTOR'S BASIS FOR LIQUIDATION VALUE |
| --- | --- | --- |
| Cash on hand | $20,550.88,000 | |

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

| ASSETS AT LIQUIDATION VALUE | LIQUIDATION VALUE | DEBTOR'S BASIS FOR LIQUIDATION VALUE |
|---|---|---|
| Mammoth Property | 14,437,500 | |
| Adversary Proceeding | 0 | |
| Recovery From Avoidance Actions | $.00 | The Debtor does not anticipate that there will be any Avoidance Actions filed. |
| **Total Assets At Liquidation Value** | $14,458,050.8814,537,000 | |
| **LESS LIABILITIES IN CHAPTER 7 CASE** | | |
| Less: Secured Creditor Recovery  1[1] | $15,503,550 | |
| Less: Chapter 7 trustee's fees and expenses | $467,625 | |

---

[5]

| | |
|---|---|
| COMERICA BANK NOTE on Effective date | $15,500,000 |
| Rotsheck Construction | $3,550 |
| | |
| | |
| | |
| TOTAL | $15,503,550 |
| | |
| | |

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

| ASSETS AT LIQUIDATION VALUE | LIQUIDATION VALUE | DEBTOR'S BASIS FOR LIQUIDATION VALUE |
|---|---|---|
| Less: Chapter 11 administrative expenses<br>Law offices of Thomas C Corcovelos<br>Clerk of Court Fees $200.00<br>UST Fees $500.00 | $1,000<br>$250<br>$500 | |
| Less: Priority Claims | $.00 | |
| **Balance for unsecured Claims** | $.00 | |
| | | |
| | | |
| **Total amount of Unsecured Claims** | $22,581.71 | |
| **% OF THEIR CLAIMS WHICH UNSECURED CREDITORS** [1] **WOULD RECEIVE OR RETAIN IN A CHAPTER 7 LIQUIDATION:**[2] | 0.00% | |

---

[2]    Note: If this percentage is greater than the amount to be paid to the unsecured Creditors on a "present value basis" under the Plan, the Plan is not confirmable unless Proponent obtains acceptance by every Creditors in an impaired class.

| ASSETS AT LIQUIDATION VALUE | LIQUIDATION VALUE | DEBTOR'S BASIS FOR LIQUIDATION VALUE |
|---|---|---|
| **% OF THEIR CLAIMS WHICH UNSECURED CREDITORS WILL RECEIVE OR RETAIN UNDER THIS PLAN:** | **One Hundred Percent of their Allowed Claim** | |

Below is a demonstration, in tabular format, that all Creditors and interest holders will receive at least as much under the Plan as such Creditor or holder would receive under a Chapter 7 liquidation.

| CLAIMS AND CLASSES | PAYOUT PERCENTAGE UNDER THE PLAN | PAYOUT PERCENTAGE IN CHAPTER 7 LIQUIDATION |
|---|---|---|

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

| CLAIMS AND CLASSES | PAYOUT PERCENTAGE UNDER THE PLAN | PAYOUT PERCENTAGE IN CHAPTER 7 LIQUIDATION |
|---|---|---|
| Administrative Claims | 100.00% | Estimated funds available for Administrative Claims would be $0 (Chapter 7 Administrative Fees and Costs are estimated at $252,750 and Chapter 11 Administrative Fees and Costs are estimated at $1,750.00) |
| | | |
| Class 1 – Comerica Bank. | 100.00% | 78% |
| Class 2 – Rotsheck Construction | 100.00% | 0% |
| Class 3 – General Unsecured Creditors. | 50% to 100% | 0% |
| | | |
| | | |
| | | |
| | | |

| CLAIMS AND CLASSES | PAYOUT PERCENTAGE UNDER THE PLAN | PAYOUT PERCENTAGE IN CHAPTER 7 LIQUIDATION |
|---|---|---|
| | | |
| Class 3 – Interest Holders | To receive pro-rata distribution of remaining Proceeds after payment of all Allowed Administrative Claims, all Allowed Secured Claims, all Allowed Priority Claims and all Allowed Unsecured Claims | 00% |

**C.   Feasibility**

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis.  The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses which are entitled to be paid on such date.  The Plan Proponent maintains that this aspect of

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

1  feasibility is satisfied as illustrated here:

2  Cash Debtor will have on hand by Effective Date        $100,000

3  **To Pay:** Administrative claims                          $1,750

4  **To Pay:** Statutory costs & charges                      00.00

5  Balance after paying these amounts…..................$98,250

6       The sources of the cash Debtor will have on hand by the

7  Effective Date, as shown above are:

8       +$100,000    Approximate cash in Debtors DIP account

9       $100,000     **Total**

10      The second aspect considers whether the Proponent will have

11 enough cash over the life of the Plan to make the required Plan

12 payments.

13      The Proponent has provided financial projections. Please

14 refer to Exhibit C for the relevant financial projections.  YOU

15 ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR

16 IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE FINANCIAL

17 PROJECTIONS.

18      In summary, the Plan proposes to pay the Class 1, 2,and 3

19 creditors through the net revenues generated from the leasing of

20 the Mammoth Property beginning on the Effective date and or

21 through the eventual sale or refinance of the Mammoth Property.

22      The final payment under the Plan is expected to be paid on

23 October 19, 2015.  The Plan Proponent contends that Debtor's

24 financial projections are feasible.

25 **V.   EFFECT OF CONFIRMATION OF PLAN**

26 A.   Discharge

27      This Plan provides that upon confirmation of the plan,

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

Debtor shall be discharged of liability for payment of debts
incurred before confirmation of the Plan to the extent specified
in 11 U.S.C. § 1141.  However, the discharge will not discharge
any liability imposed by the Plan.

**B.   Revesting of Property in the Debtor**

Except as provided in Section {V.E.}, and except as provided
elsewhere in the Plan, the confirmation of the Plan revests all
of the property of the estate in the Debtor.

**C.   Modification of Plan**

The Proponent of the Plan may modify the Plan at any time
before confirmation.  However, the Court may require a new
disclosure statement and/or re-voting on the Plan.

The Proponent of the Plan may also seek to modify the Plan
at any time after confirmation only if (1) the Plan has not been
substantially consummated <u>and</u> (2) the Court authorizes the
proposed modifications after notice and a hearing.

**D.   Post-Confirmation Status Report**

Within 120 days of the entry of the order confirming the
Plan, Plan Proponent shall file a status report with the Court
explaining what progress has been made toward consummation of the
confirmed Plan.  The status report shall be served on the United
States Trustee, the twenty largest unsecured creditors, and those
parties who have requested special notice.  Further status
reports shall be filed every 120 days and served on the same
entities.

**E.   Post-Confirmation Conversion/Dismissal**

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

1    A creditor or party in interest may bring a motion to
2  convert or dismiss the case under § 1112(b), after the Plan is
3  confirmed, if there is a default in performing the Plan.  If the
4  Court orders the case converted to Chapter 7 after the Plan is
5  confirmed, then all property that had been property of the
6  Chapter 11 estate, and that has not been disbursed pursuant to
7  the Plan, will revest in the Chapter 7, estate.  The automatic
8  stay will be reimposed upon the revested property, but only to
9  the extent that relief from stay was not previously authorized by
10  the Court during this case.

11    The order confirming the Plan may also be revoked under very
12  limited circumstances.  The Court may revoke the order if the
13  order of confirmation was procured by fraud and if a party in
14  interest brings an adversary proceeding to revoke confirmation
15  within 180 days after the entry of the order of confirmation.

16 **F.    Final Decree**

17    Once the estate has been fully administered as referred to
18  in Bankruptcy Rule 3022, the Plan Proponent, or such other party
19  as the Court shall designate in the Plan Confirmation Order,
20  shall file a motion with the Court to obtain a final decree to
21  close the case.

22

23                              Respectfully submitted,

24  DATED: February 10, 2010

25  MAMMOTH ARROWHEAD I LLC
26  A Nevada Limited Liability Company

27
   By: _____
28        Robert Wish

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

Managing Member of Mammoth Equities LLC
The manager of MAMMOTH ARROWHEAD I LLC


PRESENTED BY:
Law offices of Thomas C Corcovelos

BY:   /s/Thomas C Corcovelos
      Thomas C Corcovelos

Attorneys for Debtor and
Debtor in Possession

# VI.

## SUPPORTING DECLARATIONS

### DECLARATION OF ROBERT WISH

I, Robert Wish, declare as follows:

I am the managing member of Mammoth Equities LLC, the Manager of the debtor and debtor in possession in the bankruptcy case of In re. **MAMMOTH ARROWHEAD I LLC**, Case No. 8:09-bk-22567-RK*-

1.    I make this declaration in support of approval of Debtor's Disclosure Statement Describing Debtor's Chapter 11 Plan of Reorganization (the "Disclosure Statement"). I have personal knowledge of the matters set forth in this Declaration and if called upon to testify, I could and would testify competently thereto.

2.    I have read the Disclosure Statement and, to the best of my knowledge, all of the information contained therein is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 10, 2010 at San Juan Capistrano, California.

_____
Robert Wish

**EXHIBIT A**

**- LIST OF ALL ASSETS**

1)    A four-story 100% improved 81,457 square foot multi tenant office building with all office space built out, divisible down to two office suites, designed for maximum flexibility and ready for occupancy along with two 2 multi-tenant retail buildings totaling 13,582 square feet (8,368 and 5,351 square feet respectively) located at 17505 North 79th Avenue, Glendale, Arizona totaling further described below:

| | |
|---|---|
| Foundation: | Poured Concrete |
| Construction: | Steel |
| Exterior Walls | Walls are concrete paneled |
| Windows: | Glass and concrete/Aluminum frame dual pane tinted glass |
| Roof: | Peaked steel plate joist system |
| Walls: | Painted drywall with variations to tenant specifications |
| Floor Coverings: | Commercial grade short loop carpet over concrete |
| Ceilings: | Typically suspended acoustic ceiling pads |
| Lighting: | Suspended and recessed fluorescent and incandescent lighting |
| HVAC: | Roof-top mounted head pump systems operated by thermostats and time clocks |
| Electrical: | 1200 amp, 227/480V, 3-phase, 4-wire.  Tenant spaces are separately measured for electrical |

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

1                         – each tenant has its own electric meter

2  Restrooms:          One men's and one women's restroom per floor

3  Fire Protection:    100% wet sprinkler system

4  Elevators:          Three 3,500 lb. capacity Otis hydraulic

5  Parking Ratio:      1/3.30

6  2) Personal Property consisting of furniture fixtures and

7  equipment

8

9  2) Mammoth Adversary Proceeding

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

**EXHIBIT B – List of Litigation**

1.    <u>MAMMOTH ARROWHEAD I</u> , an Arizona Limited Liability Company; MAMMOTH EQUITIES, LLC, a Nevada limited liability company, Robert L. Wish, and Carol Lechiara, trustee of the Rayvercar International Trust vs. Comerica Bank, A California Corporation; and DOES 1 through 100, inclusive, "case No. 30-2009-00305211*

2.        JULY 31, 2009 "Loan Maturity, Demand for Payment in Full and Imminent legal Action, (Notice of Maturity)" *

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

1    **EXHIBIT C – FINANCIAL PROJECTIONS**

2    This information is supplied by <u>the Debtor</u> and is based on

3    Debtors development experience.

4

5

6        **MAMMOTH ARROWHEAD I LLC Financial Projections**

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

**GLENDALE PROFESSIONAL BUILDING**                                  17505 N 79th
Schedule Of Prospective Cash Flow                                   Glendale, AZ
**60 Month Projections**

| | PLAN START | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| For the Months | Nov-2010 | Dec-2010 | Jan-2011 | Feb-2011 | Mar-2011 | Apr-2011 | May-2011 | Jun-2011 | Jul-2011 | Aug-2011 | Sep-2011 |
| Actual Occupancy | 53.18% | 52.14% | 51.16% | 53.42% | 56.20% | 59.42% | 60.58% | 58.48% | 63.80% | 67.33% | 64.68% |
| **Potential Gross Revenue** | | | | | | | | | | | |
| Base Rental Revenue | **189,774** | 189,653 | 188,838 | 188,581 | 188,586 | 188,378 | 188,421 | 188,550 | 189,150 | 189,023 | |
| Absorption & Turnover Vacancy | **(90,525)** | (91,634) | (94,613) | (93,977) | (87,649) | (81,474) | (79,534) | (83,990) | (73,805) | (67,319) | (72,258) |
| Base Rent Abatements | **(4,422)** | (2,340) | (4,001) | (2,730) | (11,143) | (6,991) | (5,262) | (8,256) | (4,012) | (9,037) | (15,823) |
| | | | | | | | | | | | |
| Scheduled Base Rental Revenue | **94,827** | 95,679 | 90,224 | 91,874 | 89,797 | 100,117 | 103,582 | 96,175 | 110,733 | 112,794 | 100,942 |
| Expense Reimbursement Revenue | | | 4,385 | 4,217 | 4,055 | 4,055 | 4,042 | 3,693 | 3,650 | 3,704 | 3,497 |
| Janitorial Income | **2,519** | 2,453 | 2,464 | 2,492 | 2,675 | 2,892 | 2,972 | 2,828 | 3,199 | 3,455 | 3,261 |
| Parking Income | 3,100 | 3,100 | 3,100 | 3,605 | 3,605 | 3,605 | 3,605 | 3,605 | 3,605 | 3,605 | 3,605 |
| | | | | | | | | | | | |
| Total Potential Gross Revenue | **100,446** | 101,232 | 100,173 | 102,188 | 100,132 | 110,669 | 114,201 | 106,301 | 121,187 | 123,558 | 111,305 |
| Collection Loss | **(942)** | (942) | (1,042) | (1,042) | (1,041) | (1,042) | (1,042) | (1,041) | (1,042) | (1,042) | (1,041) |
| | | | | | | | | | | | |
| Effective Gross Revenue | **99,504** | 100,290 | 99,131 | 101,146 | 99,091 | 109,627 | 113,159 | 105,260 | 120,145 | 122,516 | 110,264 |
| | | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | | |
| ALARM SERVICE | **550** | 550 | 567 | 566 | 567 | 566 | 567 | 566 | 567 | 566 | 567 |
| ELEVATOR MAINTENANCE | **560** | 560 | 577 | 577 | 577 | 577 | 576 | 577 | 577 | 577 | 577 |
| HVAC | **1,435** | 1,435 | 1,478 | 1,478 | 1,478 | 1,478 | 1,478 | 1,478 | 1,478 | 1,478 | 1,478 |
| INSURANCE - LIABILITY | **1,275** | 1,275 | 1,313 | 1,313 | 1,313 | 1,314 | 1,313 | 1,313 | 1,313 | 1,314 | 1,313 |
| JANITORIAL | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| LANDSCAPING | **975** | 975 | 1,004 | 1,004 | 1,004 | 1,005 | 1,004 | 1,004 | 1,004 | 1,005 | 1,004 |
| MAINTENANCE & REPAIRS | **1,042** | 1,041 | 1,073 | 1,073 | 1,073 | 1,073 | 1,073 | 1,073 | 1,073 | 1,073 | 1,073 |
| PEST CONTROL | **70** | 70 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 |
| POOL/FOUNTAIN MAINT | **390** | 390 | 402 | 402 | 402 | 401 | 402 | 402 | 401 | 402 | 402 |
| PROPERTY MANAGEMENT FEE | **4,945** | 4,984 | 4,930 | 5,057 | 4,955 | 5,481 | 5,658 | 5,263 | 6,007 | 6,126 | 5,513 |
| PROPERTY TAXES | | | | | 126,855 | | | | | | |
| SECURITY PATROL | **490** | 490 | 505 | 505 | 505 | 504 | 505 | 505 | 504 | 505 | 505 |
| SWEEPING | **130** | 130 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 |
| TRASH REMOVAL | **160** | 160 | 165 | 165 | 165 | 165 | 165 | 164 | 165 | 165 | 165 |
| UTILITIES | **3,500** | 3,000 | 2,350 | 2,350 | 2,350 | 2,350 | 2,350 | 2,800 | 2,800 | 3,500 | 3,500 |
| WINDOW CLEANING | **175** | 175 | 180 | 180 | 180 | 181 | 180 | 180 | 180 | 181 | 180 |
| NR ADVERTISING | **500** | 500 | 515 | 515 | 515 | 515 | 515 | 515 | 515 | 515 | 515 |
| NR DIRECTORIES/DOOR NAMES | **345** | 345 | 355 | 355 | 356 | 355 | 355 | 356 | 355 | 355 | 356 |
| NR JANITORIAL | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 |
| NR JANITORIAL - SINGLE ROOMS | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| NR LEASING EXPENSE | **902** | 902 | 929 | 929 | 929 | 929 | 929 | 929 | 929 | 929 | 929 |
| NR REPAIRS & MAINTENANCE | **1,377** | 1,376 | 1,418 | 1,418 | 1,418 | 1,418 | 1,418 | 1,418 | 1,418 | 1,418 | 1,418 |
| NR TURNOVER EXPENSE | **1,250** | 1,250 | 1,288 | 1,287 | 1,288 | 1,287 | 1,288 | 1,287 | 1,288 | 1,287 | 1,288 |
| NR UTILITIES | **1,905** | 1,905 | 1,276 | 1,276 | 1,277 | 1,276 | 1,276 | 1,277 | 1,276 | 1,276 | 1,277 |
| OP EX | **2,300** | 2,300 | 2,369 | 2,369 | 2,369 | 2,369 | 8,549 | 2,369 | 2,369 | 2,369 | 2,369 |
| | | | | | | | | | | | |
| Total Operating Expenses | **29,376** | 28,913 | 28,000 | 28,125 | 154,882 | 28,550 | 34,907 | 28,782 | 29,525 | 30,347 | 29,735 |
| | | | | | | | | | | | |
| Net Operating Income | **70,128** | 71,377 | 71,131 | 73,021 | (55,791) | 81,077 | 78,252 | 76,478 | 90,620 | 92,169 | 80,529 |
| | | | | | | | | | | | |
| Debt Service (interest rate) | **3.50%** | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% |
| Class 1 Interest Payments 3.5% for 60 months | **45,208** | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 |
| Class 1 Balloon (15,500,000) Refi or Sale | | | | | | | | | | | |
| Class 2 - Rolsheck (pursuant reorg plan) | **65** | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 |
| Class 3 - Unsecured Creditors Interest (paid pursuant reorg plan) | **66** | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 |
| Class 3 - Unsecured Creditors Balloon | | | | | | | | | | | |
| | | | | | | | | | | | |
| Total Debt Service | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | |
| | | | | | | | | | | | |
| Leasing & Capital Costs | | | | | | | | | | | |
| Tenant Improvements | 405 | 575 | 834 | 1,251 | 1,400 | 974 | 834 | | 1,229 | 2,355 | |
| Leasing Commissions | 984 | 2,670 | 1,967 | 9,906 | 12,082 | 6,675 | 6,503 | 4,394 | 11,431 | 13,384 | 5,216 |
| Capital Expenditures .12 sq ft | 884 | 883 | 910 | 910 | 910 | 910 | 910 | 910 | 910 | 910 | 910 |
| | | | | | | | | | | | |
| Total Leasing & Capital Costs | **2,273** | 4,128 | 3,711 | 12,067 | 14,392 | 8,559 | 8,247 | 5,304 | 13,570 | 16,649 | 6,126 |
| | | | | | | | | | | | |
| Cash Flow After Debt Service | **$22,516** | $21,910 | $22,081 | $15,615 | $(115,522) | $27,179 | $24,666 | $25,835 | $31,711 | $30,181 | $29,064 |
| | | | | | | | | | | | |
| Cumulative Cash | **$22,516** | $44,425 | $66,506 | $82,121 | $(33,402) | $(6,223) | $18,443 | $44,277 | $75,988 | $106,169 | $135,232 |
| | | | | | | | | | | | |
| Cash Flow Before DS | **$67,855** | $67,249 | $67,420 | $60,954 | $(70,183) | $72,518 | $70,005 | $71,174 | $77,050 | $75,520 | $74,403 |
| DSCR | **1.50** | 1.48 | 1.49 | 1.34 | -1.55 | 1.60 | 1.54 | 1.57 | 1.70 | 1.67 | 1.64 |

| **Building Sale at 60th Month --->** | | **Building Sale at 60th Month** | $23,064,507 | 7.5 Cap |
|---|---|---|---|---|
| Cost of sale (5%) | | Cost of sale (5%) | $ 1,153,225 | |
| Pay off Unsecured Creditors Balloon in 60th | | Pay off Unsecured Creditors Balloon in 60th | $ 22,582 | |
| Pay off Principal | | Pay off Principal | $15,500,000 | |
| Proceeds from Sale | | Proceeds from Sale | $ 6,388,700 | |

| **Building Refinance at 60th Month --->** | | **Building Refinance at 60th Month** | $20,000,000 | |
|---|---|---|---|---|
| Cost of refinance (1.5%) | | Cost of refinance (1.5%) | $300,000.00 | |
| Pay off Unsecured Creditors Balloon in 60th | | Pay off Unsecured Creditors Balloon in 60th | $ 22,582 | |
| Pay off Principal | | Pay off Principal | $15,500,000 | |
| Proceeds from Refinance | | Proceeds from Refinance | $ 4,177,418 | |

EXHIBIT C - FINANCIAL PROJECTIONS                                                 1

| | Month 11 Oct-2011 | Month 12 Nov-2011 | Month 13 Dec-2011 | Month 14 Jan-2012 | Month 15 Feb-2012 | Month 16 Mar-2012 | Month 17 Apr-2012 | Month 18 May-2012 | Month 19 Jun-2012 | Month 20 Jul-2012 | Month 21 Aug-2012 | Month 22 Sep-2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| For the Months | | | | | | | | | | | | |
| Actual Occupancy | 63.65% | 67.92% | 74.79% | 76.88% | 80.19% | 79.44% | 77.81% | 81.06% | 80.84% | 81.88% | 77.02% | 79.65% |
| | | | | | | | | | | | | |
| Potential Gross Revenue | | | | | | | | | | | | |
| Base Rental Revenue | $188,563 | $188,620 | $188,536 | $188,643 | $188,784 | $188,857 | $188,872 | $188,920 | $194,208 | $194,223 | $193,658 | $193,471 |
| Absorption & Turnover Vacancy | (73,158) | (65,025) | (53,213) | (49,155) | (41,974) | (44,540) | (47,055) | (39,864) | (40,069) | (38,210) | (47,653) | (42,452) |
| Base Rent Abatements | (7,464) | (6,110) | (6,903) | (8,815) | (4,566) | (11,416) | (5,895) | (7,815) | (12,586) | (12,595) | (8,774) | (13,138) |
| | | | | | | | | | | | | |
| Scheduled Base Rental Revenue | 107,941 | 117,485 | 128,320 | 130,673 | 142,244 | 132,901 | 135,922 | 141,241 | 141,553 | 143,418 | 137,231 | 137,881 |
| Expense Reimbursement Revenue | 3,062 | 3,058 | 3,071 | 5,068 | 5,065 | 4,896 | 4,513 | 4,386 | 3,828 | 3,530 | 2,135 | 1,759 |
| Janitorial Income | 3,188 | 3,498 | 4,020 | 4,312 | 4,587 | 4,524 | 4,388 | 4,660 | 4,642 | 4,730 | 4,323 | 4,541 |
| Parking Income | 3,605 | 3,605 | 4,635 | 4,774 | 4,774 | 4,774 | 4,774 | 4,774 | 4,774 | 4,774 | 4,774 | 4,774 |
| | | | | | | | | | | | | |
| Total Potential Gross Revenue | 117,796 | 127,646 | 140,046 | 144,827 | 156,670 | 147,095 | 149,597 | 155,061 | 154,797 | 156,452 | 148,463 | 148,955 |
| Collection Loss | (1,042) | (1,042) | (1,041) | (1,440) | (1,440) | (1,441) | (1,440) | (1,440) | (1,441) | (1,440) | (1,441) | (1,440) |
| | | | | | | | | | | | | |
| Effective Gross Revenue | 116,754 | 126,604 | 139,005 | 143,387 | 155,230 | 145,654 | 148,157 | 153,621 | 153,356 | 155,012 | 147,022 | 147,515 |
| | | | | | | | | | | | | |
| Operating Expenses | | | | | | | | | | | | |
| ALARM SERVICE | 566 | 567 | 566 | 583 | 583 | 584 | 583 | 583 | 583 | 584 | 583 | 584 |
| ELEVATOR MAINTENANCE | 576 | 577 | 577 | 594 | 594 | 594 | 594 | 594 | 594 | 594 | 594 | 594 |
| HVAC | 1,478 | 1,478 | 1,479 | 1,522 | 1,522 | 1,523 | 1,522 | 1,522 | 1,523 | 1,522 | 1,523 | 1,522 |
| INSURANCE - LIABILITY | 1,313 | 1,313 | 1,314 | 1,353 | 1,353 | 1,352 | 1,353 | 1,353 | 1,352 | 1,353 | 1,353 | 1,352 |
| JANITORIAL | 3,000 | 3,000 | 3,000 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 |
| LANDSCAPING | 1,004 | 1,004 | 1,005 | 1,034 | 1,034 | 1,035 | 1,034 | 1,034 | 1,035 | 1,034 | 1,035 | 1,034 |
| MAINTENANCE & REPAIRS | 1,073 | 1,073 | 1,072 | 1,105 | 1,105 | 1,105 | 1,105 | 1,105 | 1,105 | 1,105 | 1,105 | 1,105 |
| PEST CONTROL | 72 | 73 | 72 | 74 | 74 | 74 | 75 | 74 | 74 | 74 | 75 | 74 |
| POOL/FOUNTAIN MAINT | 401 | 402 | 401 | 414 | 414 | 414 | 414 | 413 | 414 | 414 | 414 | 413 |
| PROPERTY MANAGEMENT FEE | 5,838 | 6,330 | 6,951 | 7,169 | 7,762 | 7,283 | 7,408 | 7,681 | 7,668 | 7,750 | 7,351 | 7,376 |
| PROPERTY TAXES | 126,855 | | | | | 130,660 | | | | | | |
| SECURITY PATROL | 504 | 505 | 504 | 520 | 520 | 520 | 520 | 520 | 520 | 519 | 520 | 520 |
| SWEEPING | 134 | 134 | 134 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 |
| TRASH REMOVAL | 165 | 164 | 165 | 170 | 170 | 170 | 169 | 170 | 170 | 170 | 169 | 170 |
| UTILITIES | 3,500 | 2,350 | 2,350 | 2,350 | 2,350 | 2,350 | 2,800 | 2,800 | 3,500 | 3,500 | 3,500 | 2,350 |
| WINDOW CLEANING | 180 | 180 | 181 | 186 | 186 | 185 | 186 | 186 | 186 | 186 | 186 | 185 |
| NR ADVERTISING | 515 | 515 | 515 | 530 | 530 | 531 | 530 | 531 | 530 | 531 | 530 | 531 |
| NR DIRECTORIES/DOOR NAMES | 355 | 355 | 356 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 |
| NR JANITORIAL | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 |
| NR JANITORIAL - SINGLE ROOMS | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| NR LEASING EXPENSE | 929 | 929 | 930 | 957 | 957 | 957 | 957 | 957 | 957 | 957 | 957 | 957 |
| NR REPAIRS & MAINTENANCE | 1,418 | 1,418 | 1,418 | 1,461 | 1,461 | 1,460 | 1,461 | 1,460 | 1,461 | 1,460 | 1,461 | 1,460 |
| NR TURNOVER EXPENSE | 1,287 | 1,288 | 1,287 | 1,326 | 1,326 | 1,326 | 1,326 | 1,326 | 1,326 | 1,326 | 1,327 | 1,326 |
| NR UTILITIES | 1,276 | 1,276 | 1,277 | 638 | 638 | 638 | 638 | 638 | 638 | 639 | 638 | 638 |
| OP EX | 2,369 | 2,369 | 2,369 | 2,440 | 2,440 | 2,440 | 2,441 | 8,804 | 2,440 | 2,440 | 2,441 | 2,440 |
| | | | | | | | | | | | | |
| Total Operating Expenses | 156,908 | 29,399 | 30,023 | 30,830 | 31,423 | 161,605 | 31,520 | 38,156 | 32,480 | 32,561 | 32,166 | 31,035 |
| | | | | | | | | | | | | |
| Net Operating Income | (40,154) | 97,205 | 108,982 | 112,557 | 123,807 | (15,951) | 116,637 | 115,465 | 120,876 | 122,451 | 114,856 | 116,480 |
| | | | | | | | | | | | | |
| Debt Service (interest rate) | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% |
| Class 1 Interest Payments 3.5% for 60 months | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 |
| Class 1 Balloon (15,500,000) Refi or Sale | | | | | | | | | | | | |
| Class 2 - Rotsheck (pursuant reorg plan) | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 |
| Class 3 - Unsecured Creditors Interest (paid pursuant reorg plan) | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 |
| Class 3 - Unsecured Creditors Balloon | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Total Debt Service | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 |
| | | | | | | | | | | | | |
| Leasing & Capital Costs | | | | | | | | | | | | |
| Tenant Improvements | 1,293 | 2,467 | 3,055 | | 775 | | | 1,731 | 1,576 | 569 | 2,578 | 1,244 |
| Leasing Commissions | 8,318 | 6,310 | 19,376 | 7,390 | 8,501 | 5,103 | 1,666 | 9,193 | 7,311 | 7,174 | 9,237 | 12,589 |
| Capital Expenditures .12 sq ft | 910 | 910 | 911 | 937 | 937 | 938 | 937 | 937 | 938 | 937 | 938 | 937 |
| | | | | | | | | | | | | |
| Total Leasing & Capital Costs | 10,521 | 9,687 | 23,342 | 8,327 | 10,213 | 6,041 | 2,603 | 11,861 | 9,825 | 8,680 | 12,753 | 14,770 |
| | | | | | | | | | | | | |
| Cash Flow After Debt Service | ($96,014) | $42,179 | $40,301 | $58,891 | $68,255 | ($67,331) | $68,695 | $58,265 | $65,712 | $68,432 | $56,764 | $56,371 |
| | | | | | | | | | | | | |
| Cumulative Cash | $39,218 | $81,397 | $121,697 | $180,588 | $248,843 | $181,511 | $250,206 | $308,471 | $374,182 | $442,614 | $499,378 | $555,748 |
| | | | | | | | | | | | | |
| Cash Flow Before DS | ($50,675) | $87,518 | $85,640 | $104,230 | $113,594 | ($21,992) | $114,034 | $103,604 | $111,051 | $113,771 | $102,103 | $101,710 |
| DSCR | -1.12 | 1.93 | 1.89 | 2.30 | 2.51 | -0.49 | 2.52 | 2.29 | 2.45 | 2.51 | 2.25 | 2.24 |

**Building Sale at 60th Month --->**
Cost of sale (5%)
Pay off Unsecured Creditors Balloon in 60th
Pay off Priincpal
Proceeds from Sale

**Building Refinance at 60th Month --->**
Cost of refinance (1.5%)
Pay off Unsecured Creditors Balloon in 60th
Pay off Prinicpal
Proceeds from Refinance

EXHIBIT C - FINANCIAL PROJECTIONS

2

| | Month 23 Oct-2012 | Month 24 Nov-2012 | Month 25 Dec-2012 | Month 26 Jan-2013 | Month 27 Feb-2013 | Month 28 Mar-2013 | Month 29 Apr-2013 | Month 30 May-2013 | Month 31 Jun-2013 | Month 32 Jul-2013 |
|---|---|---|---|---|---|---|---|---|---|---|
| For the Months | | | | | | | | | | |
| Actual Occupancy | 86.65% | 91.86% | 97.44% | 98.30% | 94.99% | 95.79% | 95.25% | 91.55% | 93.41% | 92.77% |
| | | | | | | | | | | |
| Potential Gross Revenue | | | | | | | | | | |
| Base Rental Revenue | $193,577 | $193,821 | $194,192 | $195,269 | $195,830 | $195,937 | $196,614 | $197,596 | $198,143 | $199,076 |
| Absorption & Turnover Vacancy | (29,127) | (19,673) | (8,319) | (7,464) | (11,665) | (9,732) | (10,476) | (19,313) | (14,949) | (15,237) |
| Base Rent Abatements | (9,030) | (12,055) | (17,973) | (12,557) | (11,379) | (10,655) | (6,407) | (15,727) | (5,825) | (10,691) |
| | | | | | | | | | | |
| Scheduled Base Rental Revenue | 155,420 | 162,093 | 167,900 | 175,248 | 172,786 | 175,550 | 179,731 | 162,556 | 177,369 | 173,148 |
| Expense Reimbursement Revenue | 1,326 | 1,275 | 1,269 | 3,314 | 3,180 | 3,164 | 2,983 | 2,841 | 2,704 | 2,464 |
| Janitorial Income | 5,146 | 5,615 | 6,138 | 6,407 | 6,259 | 6,338 | 6,284 | 5,926 | 6,105 | 6,044 |
| Parking Income | 4,774 | 4,774 | 4,775 | 4,917 | 4,917 | 4,917 | 4,918 | 4,917 | 4,917 | 4,917 |
| | | | | | | | | | | |
| Total Potential Gross Revenue | 166,666 | 173,757 | 180,082 | 189,886 | 187,142 | 189,969 | 193,916 | 176,240 | 191,095 | 186,573 |
| Collection Loss | (1,440) | (1,441) | (1,441) | (1,745) | (1,745) | (1,744) | (1,745) | (1,745) | (1,744) | (1,745) |
| | | | | | | | | | | |
| Effective Gross Revenue | 165,226 | 172,316 | 178,641 | 188,141 | 185,397 | 188,225 | 192,171 | 174,495 | 189,351 | 184,828 |
| | | | | | | | | | | |
| Operating Expenses | | | | | | | | | | |
| ALARM SERVICE | 583 | 584 | 584 | 601 | 601 | 601 | 601 | 601 | 601 | 601 |
| ELEVATOR MAINTENANCE | 595 | 594 | 594 | 612 | 612 | 612 | 612 | 612 | 612 | 612 |
| HVAC | 1,522 | 1,523 | 1,523 | 1,568 | 1,568 | 1,568 | 1,568 | 1,568 | 1,568 | 1,568 |
| INSURANCE - LIABILITY | 1,353 | 1,353 | 1,352 | 1,393 | 1,393 | 1,393 | 1,393 | 1,394 | 1,393 | 1,393 |
| JANITORIAL | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 |
| LANDSCAPING | 1,034 | 1,035 | 1,035 | 1,065 | 1,065 | 1,066 | 1,065 | 1,066 | 1,065 | 1,065 |
| MAINTENANCE & REPAIRS | 1,106 | 1,105 | 1,105 | 1,138 | 1,138 | 1,138 | 1,139 | 1,138 | 1,138 | 1,138 |
| PEST CONTROL | 74 | 74 | 75 | 76 | 76 | 77 | 76 | 77 | 76 | 77 |
| POOL/FOUNTAIN MAINT | 414 | 414 | 413 | 426 | 426 | 426 | 426 | 426 | 426 | 427 |
| PROPERTY MANAGEMENT FEE | 8,261 | 8,616 | 8,932 | 9,407 | 9,270 | 9,411 | 9,609 | 8,725 | 9,468 | 9,241 |
| PROPERTY TAXES | 130,661 | | | | | 134,580 | | | | |
| SECURITY PATROL | 520 | 520 | 519 | 535 | 535 | 536 | 535 | 536 | 535 | 536 |
| SWEEPING | 138 | 138 | 137 | 142 | 142 | 142 | 142 | 142 | 142 | 142 |
| TRASH REMOVAL | 170 | 170 | 169 | 175 | 175 | 175 | 175 | 175 | 175 | 174 |
| UTILITIES | 2,350 | 2,350 | 2,350 | 2,350 | 2,800 | 2,800 | 3,500 | 3,500 | 3,500 | 2,350 |
| WINDOW CLEANING | 186 | 186 | 185 | 191 | 191 | 191 | 191 | 192 | 191 | 191 |
| NR ADVERTISING | 530 | 530 | 531 | 546 | 546 | 547 | 546 | 546 | 547 | 546 |
| NR DIRECTORIES/DOOR NAMES | 366 | 366 | 366 | 377 | 377 | 377 | 377 | 377 | 377 | 377 |
| NR JANITORIAL | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 |
| NR JANITORIAL - SINGLE ROOMS | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| NR LEASING EXPENSE | 957 | 957 | 956 | 986 | 986 | 985 | 986 | 986 | 985 | 986 |
| NR REPAIRS & MAINTENANCE | 1,461 | 1,460 | 1,460 | 1,504 | 1,504 | 1,504 | 1,505 | 1,504 | 1,504 | 1,505 |
| NR TURNOVER EXPENSE | 1,326 | 1,326 | 1,327 | 1,366 | 1,366 | 1,366 | 1,366 | 1,366 | 1,366 | 1,366 |
| NR UTILITIES | 638 | 638 | 639 | 657 | 657 | 657 | 658 | 657 | 657 | 658 |
| OP EX | 2,439 | 2,440 | 2,441 | 2,513 | 2,513 | 2,514 | 2,513 | 9,070 | 2,512 | 2,514 |
| | | | | | | | | | | |
| Total Operating Expenses | 162,584 | 32,279 | 32,593 | 33,528 | 33,841 | 168,566 | 34,883 | 40,558 | 34,738 | 33,367 |
| | | | | | | | | | | |
| Net Operating Income | 2,642 | 140,037 | 146,048 | 154,613 | 151,556 | 19,659 | 157,288 | 133,937 | 154,613 | 151,461 |
| | | | | | | | | | | |
| Debt Service (interest rate) | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% |
| Class 1 Interest Payments 3.5% for 60 months | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 |
| Class 1 Balloon (15,500,000) Refi or Sale | | | | | | | | | | |
| Class 2 - Rotsheck (pursuant reorg plan) | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 |
| Class 3 - Unsecured Creditors Interest (paid pursuant reorg plan) | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 |
| Class 3 - Unsecured Creditors Balloon | | | | | | | | | | |
| | | | | | | | | | | |
| Total Debt Service | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 |
| | | | | | | | | | | |
| Leasing & Capital Costs | | | | | | | | | | |
| Tenant Improvements | 6,319 | 1,593 | 2,471 | 603 | | 1,099 | 2,126 | 586 | 2,490 | 2,963 |
| Leasing Commissions | 23,679 | 14,781 | 11,863 | 6,925 | | 4,383 | 8,818 | 2,244 | 8,525 | 10,478 |
| Capital Expenditures .12 sq ft | 937 | 938 | 938 | 966 | 966 | 965 | 966 | 965 | 966 | 965 |
| | | | | | | | | | | |
| Total Leasing & Capital Costs | 30,935 | 17,312 | 15,272 | 8,494 | 966 | 6,447 | 11,910 | 3,795 | 11,981 | 14,406 |
| | | | | | | | | | | |
| Cash Flow After Debt Service | ($73,632) | $77,386 | $85,437 | $100,780 | $105,251 | ($32,127) | $100,039 | $84,803 | $97,293 | $91,716 |
| | | | | | | | | | | |
| Cumulative Cash | $482,116 | $559,502 | $644,938 | $745,718 | $850,969 | $818,841 | $918,880 | $1,003,683 | $1,100,975 | $1,192,691 |
| | | | | | | | | | | |
| Cash Flow Before DS | ($28,293) | $122,725 | $130,776 | $146,119 | $150,590 | $13,212 | $145,378 | $130,142 | $142,632 | $137,055 |
| DSCR | -0.62 | 2.71 | 2.88 | 3.22 | 3.32 | 0.29 | 3.21 | 2.87 | 3.15 | 3.02 |

**Building Sale at 60th Month --->**
Cost of sale (5%)
Pay off Unsecured Creditors Balloon in 60th
Pay off Pnirpcal
Proceeds from Sale

**Building Refinance at 60th Month --->**
Cost of refinance (1.5%)
Pay off Unsecured Creditors Balloon in 60th
Pay off Prinipcal
Proceeds from Refinance

EXHIBIT C - FINANCIAL PROJECTIONS

3

| | Month 33 Aug-2013 | Month 34 Sep-2013 | Month 35 Oct-2013 | Month 36 Nov-2013 | Month 37 Dec-2013 | Month 38 Jan-2014 | Month 39 Feb-2014 | Month 40 Mar-2014 | Month 41 Apr-2014 |
|---|---|---|---|---|---|---|---|---|---|
| For the Months | | | | | | | | | |
| Actual Occupancy | 91.43% | 96.27% | 95.26% | 91.64% | 89.77% | 93.54% | 95.90% | 91.96% | 94.54% |
| Potential Gross Revenue | | | | | | | | | |
| Base Rental Revenue | $199,778 | $199,999 | $201,534 | $202,165 | $203,252 | $203,647 | $204,084 | $205,043 | $205,277 |
| Absorption & Turnover Vacancy | (17,929) | (8,129) | (11,489) | (18,529) | (21,979) | (14,745) | (4,978) | (13,204) | (12,780) |
| Base Rent Abatements | (6,895) | (10,342) | (8,779) | (20,609) | (4,857) | (13,455) | (11,474) | (8,604) | (8,313) |
| Scheduled Base Rental Revenue | 174,954 | 181,528 | 181,266 | 163,027 | 176,416 | 175,447 | 187,632 | 183,235 | 184,184 |
| Expense Reimbursement Revenue | 2,232 | 2,291 | 2,140 | 1,853 | 1,683 | 2,668 | 2,566 | 2,384 | 2,386 |
| Janitorial Income | 5,914 | 6,385 | 6,285 | 5,934 | 5,757 | 6,301 | 6,724 | 6,325 | 6,401 |
| Parking Income | 4,918 | 4,917 | 4,917 | 4,917 | 4,918 | 5,065 | 5,065 | 5,065 | 5,065 |
| Total Potential Gross Revenue | 188,018 | 195,121 | 194,608 | 175,731 | 188,774 | 189,481 | 201,987 | 197,009 | 198,036 |
| Collection Loss | (1,745) | (1,744) | (1,745) | (1,745) | (1,744) | (1,810) | (1,810) | (1,810) | (1,810) |
| Effective Gross Revenue | 186,273 | 193,377 | 192,863 | 173,986 | 187,030 | 187,671 | 200,177 | 195,199 | 196,226 |
| Operating Expenses | | | | | | | | | |
| ALARM SERVICE | 601 | 601 | 601 | 601 | 601 | 619 | 619 | 619 | 619 |
| ELEVATOR MAINTENANCE | 612 | 612 | 612 | 612 | 611 | 630 | 630 | 630 | 631 |
| HVAC | 1,568 | 1,568 | 1,568 | 1,568 | 1,569 | 1,615 | 1,615 | 1,615 | 1,615 |
| INSURANCE - LIABILITY | 1,393 | 1,394 | 1,393 | 1,393 | 1,394 | 1,435 | 1,435 | 1,435 | 1,435 |
| JANITORIAL | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 |
| LANDSCAPING | 1,066 | 1,065 | 1,066 | 1,065 | 1,066 | 1,097 | 1,097 | 1,098 | 1,097 |
| MAINTENANCE & REPAIRS | 1,139 | 1,138 | 1,138 | 1,138 | 1,139 | 1,172 | 1,172 | 1,173 | 1,172 |
| PEST CONTROL | 76 | 77 | 76 | 77 | 77 | 79 | 79 | 79 | 79 |
| POOL/FOUNTAIN MAINT | 426 | 426 | 426 | 426 | 427 | 439 | 439 | 439 | 439 |
| PROPERTY MANAGEMENT FEE | 9,314 | 9,668 | 9,643 | 8,699 | 9,352 | 9,384 | 10,009 | 9,760 | 9,811 |
| PROPERTY TAXES | | | 134,581 | | | | | 138,618 | |
| SECURITY PATROL | 535 | 535 | 536 | 535 | 536 | 551 | 551 | 552 | 551 |
| SWEEPING | 142 | 142 | 142 | 142 | 143 | 146 | 146 | 146 | 147 |
| TRASH REMOVAL | 175 | 175 | 175 | 175 | 174 | 180 | 180 | 180 | 180 |
| UTILITIES | 2,350 | 2,350 | 2,350 | 2,350 | 2,800 | 2,800 | 3,500 | 3,500 | 3,500 |
| WINDOW CLEANING | 191 | 192 | 191 | 191 | 192 | 197 | 197 | 197 | 197 |
| NR ADVERTISING | 546 | 547 | 546 | 546 | 547 | 563 | 563 | 563 | 563 |
| NR DIRECTORIES/DOOR NAMES | 377 | 377 | 377 | 377 | 377 | 388 | 388 | 388 | 389 |
| NR JANITORIAL | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 |
| NR JANITORIAL - SINGLE ROOMS | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| NR LEASING EXPENSE | 986 | 985 | 986 | 986 | 985 | 1,015 | 1,015 | 1,015 | 1,015 |
| NR REPAIRS & MAINTENANCE | 1,504 | 1,504 | 1,505 | 1,504 | 1,505 | 1,549 | 1,549 | 1,550 | 1,549 |
| NR TURNOVER EXPENSE | 1,366 | 1,366 | 1,366 | 1,365 | 1,366 | 1,407 | 1,407 | 1,407 | 1,407 |
| NR UTILITIES | 657 | 657 | 658 | 657 | 658 | 677 | 677 | 677 | 677 |
| OP EX | 2,513 | 2,514 | 2,513 | 2,512 | 2,514 | 2,589 | 2,589 | 2,588 | 2,589 |
| Total Operating Expenses | 33,437 | 33,793 | 168,349 | 32,819 | 33,933 | 34,432 | 35,757 | 174,129 | 35,562 |
| Net Operating Income | 152,836 | 159,584 | 24,514 | 141,167 | 153,097 | 153,239 | 164,420 | 21,070 | 160,664 |
| Debt Service (interest rate) | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% |
| Class 1 Interest Payments 3.5% for 60 months | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 |
| Class 1 Balloon (15,500,000) Refi or Sale | | | | | | | | | |
| Class 2 - Rotsheck (pursuant reorg plan) | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 |
| Class 3 - Unsecured Creditors Interest (paid pursuant reorg plan) | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 |
| Class 3 - Unsecured Creditors Balloon | | | | | | | | | |
| Total Debt Service | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 |
| Leasing & Capital Costs | | | | | | | | | |
| Tenant Improvements | 1,291 | 3,404 | 2,172 | 249 | 2,790 | 2,698 | 4,138 | 165 | 2,583 |
| Leasing Commissions | 3,489 | 10,337 | 8,401 | 1,162 | 10,330 | 10,171 | 16,272 | 759 | 6,224 |
| Capital Expenditures .12 sq ft | 966 | 965 | 966 | 965 | 965 | 994 | 994 | 995 | 994 |
| Total Leasing & Capital Costs | 5,746 | 14,706 | 11,539 | 2,376 | 14,085 | 13,863 | 21,404 | 1,919 | 9,801 |
| Cash Flow After Debt Service | $101,751 | $99,539 | ($32,364) | $93,452 | $93,673 | $94,037 | $97,677 | ($26,188) | $105,524 |
| Cumulative Cash | $1,294,442 | $1,393,980 | $1,361,616 | $1,455,068 | $1,548,740 | $1,642,777 | $1,740,454 | $1,714,265 | $1,819,789 |
| Cash Flow Before DS | $147,090 | $144,878 | $12,975 | $138,791 | $139,012 | $139,376 | $143,016 | $19,151 | $150,863 |
| DSCR | 3.24 | 3.20 | 0.29 | 3.06 | 3.07 | 3.07 | 3.15 | 0.42 | 3.33 |

**Building Sale at 60th Month --->**
Cost of sale (5%)
Pay off Unsecured Creditors Balloon in 60th
Pay off Pnincipal
Proceeds from Sale

**Building Refinance at 60th Month --->**
Cost of refinance (1.5%)
Pay off Unsecured Creditors Balloon in 60th
Pay off Prinicpal
Proceeds from Refinance

EXHIBIT C - FINANCIAL PROJECTIONS

4

| | Month 42 May-2014 | Month 43 Jun-2014 | Month 44 Jul-2014 | Month 45 Aug-2014 | Month 46 Sep-2014 | Month 47 Oct-2014 | Month 48 Nov-2014 | Month 49 Dec-2014 | Month 50 Jan-2015 |
|---|---|---|---|---|---|---|---|---|---|
| For the Months | | | | | | | | | |
| Actual Occupancy | 96.01% | 92.80% | 89.10% | 87.47% | 87.23% | 91.82% | 92.64% | 85.70% | 93.54% |
| | | | | | | | | | |
| Potential Gross Revenue | | | | | | | | | |
| Base Rental Revenue | $205,830 | $206,715 | $207,831 | $209,085 | $210,609 | $211,678 | $212,683 | $214,333 | $215,749 |
| Absorption & Turnover Vacancy | (9,418) | (15,713) | (24,669) | (27,479) | (26,954) | (17,337) | (15,753) | (31,460) | (26,418) |
| Base Rent Abatements | (7,506) | (4,941) | (5,934) | (10,340) | (10,767) | (8,508) | (11,570) | (8,675) | (4,283) |
| | | | | | | | | | |
| Scheduled Base Rental Revenue | 188,906 | 186,061 | 177,228 | 171,266 | 172,888 | 185,793 | 185,360 | 174,198 | 185,048 |
| Expense Reimbursement Revenue | 2,294 | 2,140 | 2,068 | 1,796 | 1,567 | 1,511 | 1,380 | 1,088 | 2,251 |
| Janitorial Income | 6,550 | 6,227 | 5,864 | 5,707 | 5,685 | 6,131 | 6,212 | 5,539 | 5,946 |
| Parking Income | 5,064 | 5,065 | 5,065 | 5,065 | 5,065 | 5,064 | 5,065 | 5,064 | 5,217 |
| | | | | | | | | | |
| Total Potential Gross Revenue | 202,814 | 199,493 | 190,225 | 183,834 | 185,205 | 198,499 | 198,017 | 185,889 | 198,462 |
| Collection Loss | (1,810) | (1,810) | (1,811) | (1,810) | (1,810) | (1,810) | (1,810) | (1,811) | (1,949) |
| | | | | | | | | | |
| Effective Gross Revenue | 201,004 | 197,683 | 188,414 | 182,024 | 183,395 | 196,689 | 196,207 | 184,078 | 196,513 |
| | | | | | | | | | |
| Operating Expenses | | | | | | | | | |
| ALARM SERVICE | 619 | 619 | 619 | 619 | 619 | 619 | 619 | 619 | 638 |
| ELEVATOR MAINTENANCE | 630 | 630 | 630 | 631 | 630 | 630 | 631 | 630 | 649 |
| HVAC | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,616 | 1,615 | 1,615 | 1,664 |
| INSURANCE - LIABILITY | 1,435 | 1,435 | 1,435 | 1,435 | 1,435 | 1,435 | 1,435 | 1,435 | 1,478 |
| JANITORIAL | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 |
| LANDSCAPING | 1,097 | 1,098 | 1,097 | 1,097 | 1,098 | 1,097 | 1,098 | 1,097 | 1,130 |
| MAINTENANCE & REPAIRS | 1,173 | 1,172 | 1,172 | 1,173 | 1,172 | 1,173 | 1,172 | 1,173 | 1,208 |
| PEST CONTROL | 78 | 79 | 79 | 79 | 79 | 78 | 79 | 78 | 81 |
| POOL/FOUNTAIN MAINT | 439 | 439 | 439 | 439 | 439 | 439 | 439 | 438 | 452 |
| PROPERTY MANAGEMENT FEE | 10,050 | 9,884 | 9,421 | 9,101 | 9,170 | 9,834 | 9,810 | 9,204 | 9,826 |
| PROPERTY TAXES | | | | | | 138,617 | | | |
| SECURITY PATROL | 552 | 551 | 552 | 551 | 552 | 551 | 552 | 552 | 568 |
| SWEEPING | 146 | 146 | 147 | 146 | 146 | 147 | 146 | 147 | 151 |
| TRASH REMOVAL | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 181 | 185 |
| UTILITIES | 2,350 | 2,350 | 2,350 | 2,350 | 2,350 | 2,800 | 2,800 | 3,500 | 3,500 |
| WINDOW CLEANING | 197 | 197 | 197 | 197 | 197 | 197 | 197 | 197 | 203 |
| NR ADVERTISING | 562 | 563 | 563 | 563 | 562 | 563 | 563 | 562 | 580 |
| NR DIRECTORIES/DOOR NAMES | 388 | 388 | 389 | 388 | 388 | 389 | 388 | 389 | 400 |
| NR JANITORIAL | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 |
| NR JANITORIAL - SINGLE ROOMS | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| NR LEASING EXPENSE | 1,016 | 1,015 | 1,015 | 1,015 | 1,015 | 1,016 | 1,015 | 1,016 | 1,046 |
| NR REPAIRS & MAINTENANCE | 1,550 | 1,549 | 1,550 | 1,549 | 1,550 | 1,549 | 1,549 | 1,550 | 1,596 |
| NR TURNOVER EXPENSE | 1,407 | 1,407 | 1,407 | 1,407 | 1,406 | 1,407 | 1,407 | 1,407 | 1,449 |
| NR UTILITIES | 677 | 677 | 677 | 677 | 677 | 677 | 677 | 677 | 697 |
| OP EX | 9,342 | 2,588 | 2,589 | 2,589 | 2,588 | 2,589 | 2,589 | 2,589 | 2,667 |
| | | | | | | | | | |
| Total Operating Expenses | 41,403 | 34,482 | 34,023 | 33,701 | 33,768 | 173,503 | 34,861 | 34,955 | 36,068 |
| | | | | | | | | | |
| Net Operating Income | 159,601 | 163,201 | 154,391 | 148,323 | 149,627 | 23,186 | 161,346 | 149,123 | 160,445 |
| | | | | | | | | | |
| Debt Service (interest rate) | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% |
| Class 1 Interest Payments 3.5% for 60 months | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 |
| Class 1 Balloon (15,500,000) Refi or Sale | | | | | | | | | |
| Class 2 - Rotsheck (pursuant reorg plan) | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 |
| Class 3 - Unsecured Creditors Interest (paid pursuant reorg plan) | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 |
| Class 3 - Unsecured Creditors Balloon | | | | | | | | | |
| | | | | | | | | | |
| Total Debt Service | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 |
| | | | | | | | | | |
| Leasing & Capital Costs | | | | | | | | | |
| Tenant Improvements | 2,803 | 823 | 1,824 | 2,992 | 3,052 | 4,104 | 3,240 | 1,022 | 4,623 |
| Leasing Commissions | 7,236 | 3,795 | 5,634 | 10,509 | 9,395 | 13,120 | 8,248 | 3,944 | 12,388 |
| Capital Expenditures .12 sq ft | 995 | 994 | 995 | 994 | 995 | 994 | 995 | 995 | 1,024 |
| | | | | | | | | | |
| Total Leasing & Capital Costs | 11,034 | 5,612 | 8,453 | 14,495 | 13,442 | 18,218 | 12,483 | 5,961 | 18,035 |
| | | | | | | | | | |
| Cash Flow After Debt Service | $103,228 | $112,250 | $100,599 | $88,489 | $90,846 | ($40,371) | $103,524 | $97,823 | $97,071 |
| | | | | | | | | | |
| Cumulative Cash | $1,923,017 | $2,035,266 | $2,135,865 | $2,224,354 | $2,315,199 | $2,274,828 | $2,378,352 | $2,476,174 | $2,573,245 |
| | | | | | | | | | |
| Cash Flow Before DS | $148,567 | $157,589 | $145,938 | $133,828 | $136,185 | $4,968 | $148,863 | $143,162 | $142,410 |
| DSCR | 3.28 | 3.48 | 3.22 | 2.95 | 3.00 | 0.11 | 3.28 | 3.16 | 3.14 |

**Building Sale at 60th Month --->**
Cost of sale (5%)
Pay off Unsecured Creditors Balloon in 60th
Pay off Pnincpal
Proceeds from Sale

**Building Refinance at 60th Month --->**
Cost of refinance (1.5%)
Pay off Unsecured Creditors Balloon in 60th
Pay off Prinicpal
Proceeds from Refinance

EXHIBIT C - FINANCIAL PROJECTIONS

5

| | Month 51 Feb-2015 | Month 52 Mar-2015 | Month 53 Apr-2015 | Month 54 May-2015 | Month 55 Jun-2015 | Month 56 Jul-2015 | Month 57 Aug-2015 | Month 58 Sep-2015 | Month 59 Oct-2015 |
|---|---|---|---|---|---|---|---|---|---|
| For the Months | | | | | | | | | |
| Actual Occupancy | 95.90% | 91.96% | 94.54% | 96.01% | 92.80% | 89.10% | 87.47% | 87.23% | 91.82% |
| | | | | | | | | | |
| Potential Gross Revenue | | | | | | | | | |
| Base Rental Revenue | 216,217 | 216,335 | 216,671 | 217,099 | 217,222 | 217,621 | 217,995 | 218,573 | 220,105 |
| Absorption & Turnover Vacancy | (10,844) | (4,505) | (770) | (1,026) | (8,300) | (12,974) | (13,914) | (22,542) | (31,794) |
| Base Rent Abatements | (12,855) | (16,295) | (6,838) | (8,292) | (8,836) | (1,407) | (8,638) | (12,796) | (9,819) |
| | | | | | | | | | |
| Scheduled Base Rental Revenue | 192,518 | 195,535 | 209,063 | 207,781 | 200,086 | 203,240 | 195,443 | 183,235 | 178,492 |
| Expense Reimbursement Revenue | 2,238 | 2,264 | 2,290 | 2,246 | 2,263 | 2,147 | 2,007 | 1,787 | 1,372 |
| Janitorial Income | 6,681 | 7,011 | 7,143 | 7,134 | 6,825 | 6,578 | 6,513 | 6,159 | 5,697 |
| Parking Income | 5,217 | 5,217 | 5,216 | 5,217 | 5,217 | 5,217 | 5,216 | 5,217 | 5,217 |
| | | | | | | | | | |
| Total Potential Gross Revenue | 206,654 | 210,027 | 223,712 | 222,378 | 214,391 | 217,182 | 209,179 | 196,398 | 190,778 |
| Collection Loss | (1,949) | (1,949) | (1,948) | (1,949) | (1,949) | (1,948) | (1,949) | (1,949) | (1,948) |
| | | | | | | | | | |
| Effective Gross Revenue | 204,705 | 208,078 | 221,764 | 220,429 | 212,442 | 215,234 | 207,230 | 194,449 | 188,830 |
| | | | | | | | | | |
| Operating Expenses | | | | | | | | | |
| ALARM SERVICE | 638 | 637 | 638 | 638 | 637 | 638 | 637 | 638 | 638 |
| ELEVATOR MAINTENANCE | 649 | 649 | 649 | 649 | 650 | 649 | 649 | 649 | 649 |
| HVAC | 1,664 | 1,663 | 1,664 | 1,663 | 1,664 | 1,663 | 1,664 | 1,664 | 1,663 |
| INSURANCE - LIABILITY | 1,478 | 1,478 | 1,478 | 1,478 | 1,478 | 1,478 | 1,478 | 1,478 | 1,478 |
| JANITORIAL | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 |
| LANDSCAPING | 1,130 | 1,130 | 1,131 | 1,130 | 1,130 | 1,131 | 1,130 | 1,130 | 1,130 |
| MAINTENANCE & REPAIRS | 1,208 | 1,207 | 1,208 | 1,207 | 1,208 | 1,208 | 1,207 | 1,208 | 1,207 |
| PEST CONTROL | 81 | 81 | 81 | 81 | 81 | 82 | 81 | 81 | 81 |
| POOL/FOUNTAIN MAINT | 452 | 452 | 452 | 452 | 452 | 452 | 452 | 453 | 452 |
| PROPERTY MANAGEMENT FEE | 10,235 | 10,404 | 11,088 | 11,021 | 10,622 | 10,762 | 10,362 | 9,722 | 9,442 |
| PROPERTY TAXES | | 142,776 | | | | | | | 142,776 |
| SECURITY PATROL | 568 | 568 | 568 | 568 | 568 | 568 | 568 | 568 | 568 |
| SWEEPING | 151 | 151 | 150 | 151 | 151 | 150 | 151 | 151 | 151 |
| TRASH REMOVAL | 185 | 186 | 185 | 186 | 185 | 186 | 185 | 186 | 185 |
| UTILITIES | 3,500 | 2,350 | 2,350 | 2,350 | 2,350 | 2,350 | 2,350 | 2,800 | 3,500 |
| WINDOW CLEANING | 203 | 203 | 203 | 203 | 203 | 203 | 202 | 203 | 203 |
| NR ADVERTISING | 580 | 579 | 580 | 580 | 579 | 580 | 580 | 579 | 580 |
| NR DIRECTORIES/DOOR NAMES | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| NR JANITORIAL | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 |
| NR JANITORIAL - SINGLE ROOMS | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| NR LEASING EXPENSE | 1,046 | 1,045 | 1,046 | 1,046 | 1,045 | 1,046 | 1,046 | 1,045 | 1,046 |
| NR REPAIRS & MAINTENANCE | 1,596 | 1,596 | 1,596 | 1,596 | 1,596 | 1,596 | 1,596 | 1,596 | 1,596 |
| NR TURNOVER EXPENSE | 1,449 | 1,449 | 1,449 | 1,449 | 1,449 | 1,449 | 1,449 | 1,449 | 1,449 |
| NR UTILITIES | 697 | 698 | 697 | 697 | 698 | 697 | 697 | 698 | 697 |
| OP EX | 2,667 | 2,666 | 2,667 | 2,667 | 2,667 | 2,666 | 2,667 | 2,666 | 2,666 |
| | | | | | | | | | |
| Total Operating Expenses | 36,477 | 178,268 | 36,180 | 43,066 | 35,713 | 35,854 | 35,901 | 35,264 | 178,457 |
| | | | | | | | | | |
| Net Operating Income | 168,228 | 29,810 | 185,584 | 177,363 | 176,729 | 179,380 | 171,329 | 159,185 | 10,373 |
| | | | | | | | | | |
| Debt Service (interest rate) | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% |
| Class 1 Interest Payments 3.5% for 60 months | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 | 45,208 |
| Class 1 Balloon (15,500,000) Refi or Sale | | | | | | | | | |
| Class 2 - Rotsheck (pursuant reorg plan) | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 |
| Class 3 - Unsecured Creditors Interest (paid pursuant reorg plan) | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 |
| Class 3 - Unsecured Creditors Balloon | | | | | | | | | |
| | | | | | | | | | |
| Total Debt Service | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 | 45,339 |
| | | | | | | | | | |
| Leasing & Capital Costs | | | | | | | | | |
| Tenant Improvements | 5,811 | 2,338 | 822 | 170 | | 226 | 1,973 | 1,874 | 2,416 |
| Leasing Commissions | 18,045 | 5,551 | 3,734 | 770 | | 1,026 | 8,032 | 6,965 | 9,455 |
| Capital Expenditures .12 sq ft | 1,024 | 1,024 | 1,025 | 1,024 | 1,024 | 1,025 | 1,024 | 1,024 | 1,024 |
| | | | | | | | | | |
| Total Leasing & Capital Costs | 24,880 | 8,913 | 5,581 | 1,964 | 1,024 | 2,277 | 11,029 | 9,863 | 12,895 |
| | | | | | | | | | |
| Cash Flow After Debt Service | $98,009 | ($24,442) | $134,664 | $130,060 | $130,366 | $131,764 | $114,961 | $103,983 | ($47,861) |
| | | | | | | | | | |
| Cumulative Cash | $2,671,254 | $2,646,811 | $2,781,475 | $2,911,535 | $3,041,900 | $3,173,664 | $3,288,625 | $3,392,607 | $3,344,746 |
| | | | | | | | | | |
| Cash Flow Before DS | $143,348 | $20,897 | $180,003 | $175,399 | $175,705 | $177,103 | $160,300 | $149,322 | ($2,552) |
| DSCR | 3.16 | 0.46 | 3.97 | 3.87 | 3.88 | 3.91 | 3.54 | 3.29 | -0.06 |

| Building Sale at 60th Month ---> | | | |
|---|---|---|---|
| Cost of sale (5%) | 203 | Building Sale at 60th Month | $ 23,064,507 |
| Pay off Unsecured Creditors Balloon in 60th | | Cost of sale (5%) | $ 1,153,225 |
| Pay off Prinipcal | | Pay off Unsecured Creditors Balloon in 60th | $ 22,582 |
| Proceeds from Sale | | Pay off Prinipcal | $ 15,500,000 |
| | | Proceeds from Sale | $ 6,388,700 |

| Building Refinance at 60th Month ---> | | | |
|---|---|---|---|
| Cost of refinance (1.5%) | | Building Refinance at 42nd Month | $ 20,000,000 |
| Pay off Unsecured Creditors Balloon in 60th | | Cost of refinance (1.5%) | $ 300,000 |
| Pay off Prinipcal | | Pay off Unsecured Creditors Balloon in 60th | $ 22,582 |
| Proceeds from Refinance | | Pay off Prinipcal | $ 15,500,000 |
| | | Proceeds from Refinance | $ 4,177,418 |

EXHIBIT C - FINANCIAL PROJECTIONS

6

**EXHIBIT D - UNEXPIRED LEASES TO BE ASSUMED:**

| LEASES | ARREARS/DMGS | METHODS OF CURE |
|---|---|---|
| ·Description = N/A<br><br>·Lessor's name = N/A<br>·Lessee's name =<br><br>·Expiration date = vary | ·Default amt = 0<br>·Actual pecuniary loss  =0 | ·Method of curing default &<br>  loss = Not<br>  Applicable |
|  |  |  |
|  |  |  |

**No Leases are being assumed**

### Executory Contracts to be Assumed

The Reorganized Debtor shall assume the "Mammoth Equities Property Management Group" property management contract in accordance with the provisions as set forth in the existing contract.

1   **EXHIBIT E- LIST OF GENERAL UNSECURED CREDITORS**

2   To be provided 21 days before disclosure statement hearing

# UNITED STATES BANKRUPTCY COURT
## Central District of California

In re    Mammoth Arrowhead I, LLC                    ,
                        Debtor

Case No. _____

Chapter    11

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

Following is the list of the debtor's creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 [or chapter 9] case.  The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C.§ 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims. If a minor child is one of the creditors holding the 20 largest unsecured claims, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name.  See 11 U.S.C. § 112 and Fed. R. Bankr. P. 1007(m).

| (1)<br>*Name of creditor and complete mailing address including zip code* | (2)<br>*Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3)<br>*Nature of claim (trade debt, bank loan, government contract, etc.* | (4)<br>*Indicate if claim is contingent, unliquidated, disputed or subject to setoff* | (5)<br>*Amount of claim [if secured also state value of security]* |
|---|---|---|---|---|
| Noble Protection Systems, LLC 3550 E. Altadena Avenue Phoenix, AZ 85028 | | | | 20.31 |
| Western Exterminator Company 628 N. 24th Street Phoenix, AZ 85008-6016 | | | | 65.00 |
| Sierra Fire & Communications 11048 N. 23rd Drive Ste 100 Phoenix, AZ 85029 | | | | 68.85 |

Exhibit E - Unsecured Creditors

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc. | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |

Sundance Sweeping
P. O. Box 3204
Gilbert, AZ 85299                                                                130.00

Budget Lock and Key
P. O. Box 25565
Scottsdale, AZ 85255                                                             140.00

Waste Management
1580 E. Elwood Street
Phoenix, AZ 85040                                                               161.58

America's Instant
Signs
2539 E. Rose Garden
Lane #100
Phoenix, AZ 85050                                                               205.78

Sonoran Integrations
45112 N. 20 Street
Phoenix, AZ 85087                                                               381.00

Waterworks by
George
2828 E. Saint John
Road
Phoenix, AZ 85032                                                               390.00

City of Glendale
P. O. Box 500
Glendale, AZ
85311-500                                                                      431.63

Cox Communications
P. O. Box 78071
Phoenix, AZ
85062-8071                                                                     455.92

Bankruptcy2009 ©1991-2009, New Hope Software, Inc., ver 4.5.0-743 - 32606 - PDF-XChange 3.0

Exhibit E - Unsecured Creditors

| (1) | (2) | (3) | (4) | (5) |
|-----|-----|-----|-----|-----|
| *Name of creditor and complete mailing address including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.* | *Indicate if claim is contingent, unliquidated, disputed or subject to setoff* | *Amount of claim [if secured also state value of security]* |

U.S. Security
Associates, Inc.
200 Mansell Court
5th Floor
Roswell, GA 30076                                                          490.00

Source Refrigeration
& HVAC Inc
P. O. Box 515229
Los Angeles, CA
90051-6529                                                                 541.56

Botanicare Landscape
Management, Inc.
14426 North Fifth
Place
Phoenix, AZ 85022                                                        1,992.72

VIP Window
Cleaning
1258 W. Southern
Ave #A-104
Tempe, AZ 85282                                                          2,025.00

APS
P. O. Box 2906
Phoenix, AZ
85062-2906                                                              3,575.81

One Way General
Contractors LLC
234 S. Hibbert
Mesa, AZ 85210                                                           3,684.45

Ace Building
Maintenance
7020 N. 55th Avenue
Glendale, AZ 85301                                                       7,822.10

Bankruptcy2009 ©1991-2009, New Hope Software, Inc.- ver.4.5.0-743 - 32606 - PDF-XChange 3.0

Exhibit E - Unsecured Creditors

DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF CORPORATION OR PARTNERSHIP

I, [the president or other officer or an authorized agent of the corporation] named as debtor in this case, declare under penalty of perjury that I have read the foregoing LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS and that it is true and correct to the best of my information and belief.

Date    November 12, 2009

Signature    /s/ Robert L. Wish

ROBERT L. WISH,
CEO of Mammoth Equities LLC, Manager of
Mammoth Arrowhead I, LLC

Bankruptcy2009 ©1991-2009, New Hope Software, Inc., ver. 4.5.0-743 - 32606 - PDF-XChange 3.0

**EXHIBIT F– LIST OF EQUITY INTEREST HOLDERS**

Name

% Interest

Corcovelos Law Group
Attorneys at Law
1001 Sixth StreetSuite 150
Manhattan Beach, California 90266

**7 – DAY PACKAGE**

**Item 6——List of Insiders**

NTC & CO., FBO FARRELL G. HINKLE
A/C # 005706480001
P.O. BOX 173859
DENVER, CO 80217-3859


GAIL V. ANDERSON
405 7TH ST.
MANHATTAN BEACH, CA 90266


DONALD L. BROTHERS
416 N. ONTARE ROAD
SANTA BARBARA, CA 93105

THOMAS C. GATES, M.D., A MED, CORP.
RETIREMENT TRUST DATED 2/1/96
1740 PASEO DEL MAR
PALOS VERDES, CA 90274


HARRY MARINOW TRUST
HARRY MARINOW
P.O. BOX 1480
SUNSET BEACH, CA 90742

HARRY MARINOW, TTEE OF HARRY MARINOW
FAMILY TRUST, UTD 05/15/03
P.O. BOX 1480
SUNSET BEACH, CA 90742


HANNIGAN EQUITIES, LLC
35 VALLEY VIEW
IRVINE, CA 92603

JAY EMERSON DAVIS TRUST
JAY EMERSON DAVIS TRUSTEE
2316 PASEO CIRCULO
TUSTIN, CA 92782


GLORIA ST AMANT ITF ERIK ST. AMANT
22300 Barbacoa Drive
Saugus, CA 91350

JESSE M. & AIMEE C. WERNER
11491 E. BECK LANE
SCOTTSDALE, AZ 85255

ALAN STEVEN INC. PROFIT SHARING TRUST
ALAN S. PEKARCIK
1532 KENSING LANE
LEMON HEIGHTS, CA 92705

DEBRA BARACH M.D.
17726 PALORA STREET
ENCINO, CA 91316

WILLIAM BERNSTEIN M.D.
3401 MULLDAE AVE.
SAN PEDRO, CA 90732

BERT FERRARI IRA #2382364
C/O KC LIFE CHRISTI SCOTT PENSION DEP
2012 MUNTON CIR.
TUSTIN, CA 92780

CHRISTOPHER AND DIANE TOCI
5501 EAST VIA LOS CABALLOS
PARADISE VALLEY, AZ 85253

BARTON V. HILLIARD
& GLENN M. BOTHWELL
22706 VIA SANTA ROSA
MISSION VIEJO, CA 92691

DANIEL C. CARLTON & LOUCINDA CARLTON
HUSBAND & WIFE AS COMMUNITY PROPERTY
17 WHITEWOOD WAY
IRVINE, CA 92612

DAVID C. ANDERSON, IRA #18337
IRA RESOURCES, INC.
70 CORTE DEL BAYO
LARKSPUR, CA 94939

```
DAVID CLARK
TRUSTEE OF CLARK LAW FIRM PC 401K PLN
238 W. MAIN STREET, #101
TUSTIN, CA 92780

DEBORAH A. CHRISTENSEN
LIVING TRUST DATED 06/13/00
3040 APPLETREE DR.
LAKE HAVASU CITY, AZ 86404

DEENA M. MC ALEER, A SINGLE WOMAN
JOSEPH B. MC ALEER,FATHER BENEFICIARY
27562 GENIL
MISSION VIEJO, CA 92691


DENNIS W. AND CHRISTINE J. BROTHERS
19472 DORADO DRIVE
TRABUCO CANYON, CA 92679


DONALD L. BROTHERS
416 N. ONTARE ROAD
SANTA BARBARA, CA 93105

DONNA D. FERRARI, IRA #2711816,
C/O KC LIFE CHRISTI SCOTT PENSION DEP
2012 MUNTON CIR.
TUSTIN, CA 92780

HASKE FAMILY TRUST
EDWARD E. HASKE
13211 FOOTHILL
SANTA ANA, CA 92705

ERIC J. WICHTERMAN
PROFIT SHARING PLAN
2901 N. MANOR DRIVE EAST
PHOENIX, AZ 85014
```

JAY LICHMAN & HENNIE SONDEZ, TRUSTEES
FOR THE LICHMAN FAMILY TRUST, 8/2/94
610 KINGS RD.
NEWPORT BEACH, CA 92663

JOSEPH A. RYERSON, A MARRIED
MAN AS HIS SEPARATE PROPERTY
25 MOUNTAIN LAUREL
DOVE CANYON, CA 92679

JOHN P. & PATRICK C. HANNIGAN
FATHER AND SON
1564 DELEON WAY
LIVERMORE, CA 94550

KENNETH DISESSA
17 BERRY LANE
RANDOLPH, NJ 07869

KONIAG DEVELOPMENT CORPORATION
ATTENTION OF TONY CAGE
4300 B STREET, SUITE 407
ANCHORAGE, AK 99503

CHARLES SCHWAB & CO., INC.
FBO RAYMOND C. CAMERO ACCT #4197-3821
16634 CUMBRE VERDE COURT
PACIFIC PALISADES, CA 90272

PLDC INC. PENSION ACCOUNT
LEE ROTSHECK
310 ARROYO DRIVE
ENCINITAS, CA 92024

MAHENDRA B. SHAH CPA
401K & PROFIT SHARING PLAN
6454 RIDGE GLEN ROAD
ANAHEIM HILLS, CA 92807

MARLENE A. MC ALEER IRA #2485476
C/O KC LIFE CHRISTI SCOTT PEN, DEPT
21901 150TH AVE.
MONTICELLO, IA 52310

MAUREEN NEGLIA IRA # 2644842
C/O KC LIFE CHRISTI SCOTT
7811 APPALOOSA TRAIL
ORANGE, CA 92869

FBO MICHELLE L. WALTERS
STARR & WALTERS PS TR DTD 12/30/97
3 CHAPARRAL CT.
LAS FLORES, CA 92688

MILLER FAMILY TRUST 30 MARCH 1979
EDWARD MILLER TRUSTEE
1815 SANTIAGO DRIVE
NEWPORT BEACH, CA 92660

PATRICK C. HANNIGAN
FATHER AND SON
7922 DIANA LANE
DUBLIN, CA 94568

PETER & JOANN KIRK LIVING TRUST
18161 BLUE RIDGE DR.
SANTA ANA, CA 92705

PETERSEN ALUMINUM SALES INC. PENSION
301 FOREST AVE.
LAGUNA BEACH, CA 92651

PHILLIP J & KATHLEEN M RODRIGUEZ TTEE
THE RODRIGUEZ FAMILY TRUST DATED 8/98
P.O. BOX 2047
VISTA, CA 92085-2047

MATTHEW TAYLOR PIPKIN 2000 IRREV TRST
U/A/D - 4/7/00
2401 BONNIE PLACE
COSTA MESA, CA 92627

POTAWATOMI CAPITAL COMPANY
C/O CAROL LEESE, CEO
320 E. BUFFALO ST., SUITE 607
MILWAUKEE, WI 53202

RAYMOND C. CAMERO, TTEE OF RAYMOND &
LESLIE CAMERO 1983 TRUST DTD 05/10/83
16634 CUMBRE VERDE CT.
PACIFIC PALISADES, CA 90272

WILLIAM M. RUSSELL & RENA A.
STATHACOPOULOS, TRUSTEES, UDA 8/15/05
9625 JAQUIMA DR.
ATASCADERO, CA 93422

NHRA MEDICAL GROUP, INC. 401K/PSP
FBO RICHARD TAKETA M.D.
742 WASHINGTON BLVD.
MARINA DEL REY, CA 90292

ROCHELLE W. MC ALEER IRA #2480386
C/O KC LIFE CHRISTI SCOTT PENSION DEP
14132 S.W. CARFAX AVE.
TUSTIN, CA 92780

C. ROGER J. & JEAN L. JOHNSON
HUSBAND & WIFE, AS COMMUNITY PROPERTY
3317 S. BIRCH ST.
SANTA ANA, CA 92707

ADAMSON FAMILY REVOCABLE TRUST
DATED 8/28/96
4009 74TH AVE CT NW
GIG HARBOR, WA 98335

COAST SURVEYING, INC. EMPLOYEE'S
RETIREMENT PLAN, RUEL DEL CASTILLO
15031 PARKWAY LOOP, STE B
TUSTIN, CA 92780

GARY S. SCHOENBACHLER ACCT #2485019
C/O KC LIFE CHRISTI SCOTT PENSION DEP
14642 CHARLOMA DR.
TUSTIN, CA 92780

SHAFER FAMILY TRUST DTD 09/06/00
STANTON A. & LINDA C. SHAFER, TRUSTEE
4234 N 58TH ST
PHOENIX, AZ 85018

SHIRLEY T. LEWIS
2073 ARLINGTON DR.
ANCHORAGE, AK 99517

STEPHEN L. MC ALEER  #2482685
C/O KC LIFE CHRISTI SCOTT PENSION DE
21901 150TH AVE.
MONTICELLO, IA 52310

PIPKIN HOLDING, INC.
PENSION PURCH PLN. U/A/D 5/15/96
2401 BONNIE PLACE
COSTA MESA, CA 92627

WERNER FAMILY TRUST
11445 E. BELONY DRIVE
SCOTTSDALE, AZ 85254

WILLIAM PARKS AND KERRY PARKS, TTEE
PARKS FAMILY TRUST U/A DTD 12/05/97
26821 ANADALE DRIVE
LAGUNA HILLS, CA 92653

TIMOTHY LUNN AND SUZANNE LUNN
LIVING TRUST
28811 GLEN RIDGE
MISSION VIEJO, CA 92692

THOMAS IWANSKI AND SUE IWANSKI
HUSBAND & WIFE, AS COMMUNITY PROPERTY
1541 AMBERWOOD DRIVE
SANTA ANA, CA 92705

THOMAS & CORY BREAM
HUSBAND & WIFE, AS COMMUNITY PROPERTY
3635 SANTA MARIA LANE
SANTA BARBARA, CA 93105

AMBER V. WISH
25 MOUNTAIN LAUREL
DOVE CANYON, CA 92679


COURTNEY P. WISH
7 WILLOW VIEW LANE
COTO DE CAZA, CA 92679


FRANK C. WISH
25 MOUNTAIN LAUREL
DOVE CANYON, CA 92679


ROBERT L. WISH, TRUSTEE,
FBO JOHNNY RAY WISH
25 MOUNTAIN LAUREL
DOVE CANYON, CA 92679

JARED A. STEINBERG
7 WILLOW LANE
COTO DE CAZA, CA 92679

GUNNAR AND SCARLETT GUDMUNDSSON
HUSBAND & WIFE, AS COMMUNITY PRO
724 LA MIRADA AVE.
ENCINITAS, CA 92024

1 | **EXHIBIT G- LAST TWO YEARS FINANCIAL STATEMENTS**

**1041 MAMMOTH ARROWHEAD I, LLC**
**BALANCE SHEET**
As At December 31, 2008

March 30, 2009  10:07 AM
Page 1

| | YTD Actual |
|---|---|
| **A S S E T S** | |
| **CURRENT ASSETS** | |
| CASH IN BANK | 1,158,405.56 |
| REFUNDABLE UTILITIES | 18,600.00 |
| ACCOUNTS RECEIVABLE | 77,140.19 |
| A/R TENANT REIMBURSEMENTS | 2,601.54 |
| ALLOWANCE FOR BAD DEBTS | (45,181.22) |
| NOTES RECEIVABLE - ME, LLC | 939,566.20 |
| TOTAL CURRENT ASSETS | 2,151,132.27 |
| | |
| **FIXED ASSETS** | |
| LAND | 2,045,152.90 |
| BUILDING | 12,179,390.62 |
| ACCUM DEPR - BUILDING | (637,596.54) |
| TENANT IMPROVEMENTS | 2,638.13 |
| BUILDING IMPROVEMENTS | 16,409.07 |
| ACCUMULATED DEPR - IMPROVEMENTS | (14.09) |
| TOTAL FIXED ASSETS | 13,605,980.09 |
| | |
| **OTHER ASSETS** | |
| LEASING COMMISSION | 178,585.63 |
| ACCUM AMORT  LEASING COMMISSIONS | (135,232.57) |
| LOAN FEES | 515,871.00 |
| ACCUM AMORT - LOAN FEES | (437,790.75) |
| TOTAL OTHER ASSETS | 121,433.31 |
| | |
| TOTAL ASSETS | 15,878,545.67 |
| | |
| **L I A B I L I T I E S  &  C A P I T A L** | |
| **LIABILITIES** | |
| **CURRENT LIABILITIES** | |
| ACCOUNTS PAYABLE | 39,827.70 |
| ACCRUED EXPENSES | 747.14 |
| ACCCRUED PROPERTY TAXES | 123,159.33 |
| PREPAID RENTS | 44,702.22 |
| REFUNDABLE TENANT DEPOSITS | 82,816.50 |
| TOTAL CURRENT LIABILITIES | 291,252.89 |
| | |
| **LONG TERM LIABILITIES** | |
| NOTES PAYABLE - COMERICA | 15,500,000.00 |
| NOTES PAYABLE - COMERICA LC RESERVE | (96,482.86) |
| NOTES PAYABLE - COMERICA INT RESERVE | (1,000,000.00) |
| TOTAL LONG TERM LIABILITIES | 14,403,517.14 |
| | |
| TOTAL LIABILITIES | 14,694,770.03 |

**1041 MAMMOTH ARROWHEAD I, LLC**
**BALANCE SHEET**
As At December 31, 2008

March 30, 2009  10:07 AM
Page 2

|  | YTD Actual |
| --- | --- |
| **CAPITAL** | |
| CAPITAL | 1,911,225.91 |
| NET PROFIT/(LOSS) | (727,450.27) |
| TOTAL CAPITAL | 1,183,775.64 |
| TOTAL LIABILITIES & CAPITAL | 15,878,545.67 |

**1041 MAMMOTH ARROWHEAD I, LLC**
**INCOME STATEMENT**
For the 12 Months Ending December 31, 2008

March 30, 2009  10:07 AM
Page 1

| | YTD Actual |
|---|---:|
| **REVENUE** | |
| MINIMUM RENTS | 1,337,199.69 |
| ABATED RENT | (121,081.99) |
| JANITORIAL SERVICE | 18,471.00 |
| COMMON AREA MAINTENANCE | 494.70 |
| PARKING LOT INCOME | 34,920.00 |
| COUNTY TAX | (247.96) |
| CITY TAX | (3,611.97) |
| EARLY LEASE TERMINATION FEE | 19,248.62 |
| LATE CHARGES | 7,853.49 |
| NSF CHARGES | 100.00 |
| WRITEOFFS | (3,300.93) |
| INTEREST EARNED | 42,129.38 |
| | |
| GROSS REVENUE | 1,332,174.03 |
| | |
| **COMMON AREA MAINTENANCE** | |
| ALARM SVC/MAINT/REPAIRS-(CAM) | 4,284.59 |
| ELEVATOR MAINT.--(CAM) | 7,309.99 |
| HVAC-(CAM) | 18,335.74 |
| INSURANCE-LIABILITY (CAM) | 15,115.05 |
| JANITORIAL (CAM) | 24,376.07 |
| LANDSCAPING (CAM) | 11,269.76 |
| LOCKS & KEYS (CAM) | 9.60 |
| MAINTENANCE-(CAM) | 4,331.75 |
| MISCELLANEOUS (CAM) | 237.41 |
| POWER WASH/STEAM CLEAN (CAM) | 2,805.00 |
| PEST CONTROL (CAM) | 865.00 |
| POOL/FOUNTAIN MAINT/(CAM) | 4,620.00 |
| PROPERTY MANAGEMENT FEE (CAM) | 63,454.47 |
| PROPERTY TAXES (CAM) | 246,318.54 |
| REPAIRS-CAM | 1,949.74 |
| SECURITY PATROL-(CAM) | 5,760.00 |
| SIGNS (CAM) | 1,457.10 |
| SWEEPING (CAM) | 1,560.00 |
| TRASH REMOVAL (CAM) | 1,776.00 |
| UTILITIES | 30,747.66 |
| WINDOW CLEANING-(CAM) | 7,090.00 |
| | |
| TOTAL COMMON AREA MAINTENANCE | 453,673.47 |
| | |
| **BUILDING EXPENSES** | |
| ADVERTISING (BLDG.) | 36,600.36 |
| CONSULTING-(BLDG) | 1,900.00 |
| DIRECTORIES/DOOR NAMES-(BLDG) | 693.14 |
| H.V.A.C. (BLDG.) | 275.43 |
| JANITORIAL--(BLDG) | 36,152.03 |
| LANDSCAPING (BLDG.) | 66.12 |
| LEASING EXPENSES-(BLDG) | 28,305.00 |
| TURNOVER EXPENSES | 6,986.68 |
| REPAIRS & MAINT.-BUILDING | 10,003.42 |

**1041 MAMMOTH ARROWHEAD I, LLC**
**INCOME STATEMENT**
For the 12 Months Ending December 31, 2008

March 30, 2009  10:08 AM
Page 2

| | YTD Actual |
|---|---|
| UTILITIES-BUILDING | 38,828.56 |
| **TOTAL BUILDING EXPENSES** | 159,810.74 |
| | |
| **OPERATING EXPENSES** | |
| ACCOUNTING EXPENSE | 7,112.00 |
| APPRAISAL FEES | 9,520.00 |
| BAD DEBT EXPENSE | 50,740.34 |
| BANK CHARGES | 151.35 |
| COURIER EXPENSE | 44.81 |
| MANAGEMENT EXPENSE ALLOCATION | 17,873.45 |
| DUES & SUBSCRIPTIONS | 489.00 |
| FEES & PERMITS | 122.37 |
| FORMS/LLC'S/SEC OF STATE | 439.00 |
| INTEREST EXPENSE | 683,076.78 |
| LEGAL EXPENSE | 20,796.68 |
| LOAN FEES | 1,093.50 |
| MISCELLANEOUS EXPENSES | 4,216.01 |
| OFFICE SUPPLIES & EXPENSE | 491.15 |
| TITLE FEES | 768.00 |
| TRAVEL & ACCOMODATIONS | 2,018.77 |
| **TOTAL OPERATING EXPENSES** | 798,953.21 |
| **OTHER EXPENSES** | |
| AMORTIZATION | 332,865.30 |
| DEPRECIATION | 313,521.58 |
| FRANCHISE TAX | 800.00 |
| **TOTAL OTHER EXPENSES** | 647,186.88 |
| | |
| NET PROFIT/(LOSS) | (727,450.27) |

**1068 M Arrowhead I, LLC - Debtor in Possession**
**BALANCE SHEET**
As At December 31, 2009

January 18, 2010  2:09 PM
Page 1

|  | YTD Actual |
|---|---|
| **A S S E T S** | |
| **CURRENT ASSETS** | |
| CASH IN BANK | 161,895.17 |
| ACCOUNTS RECEIVABLE | (43,309.65) |
| TOTAL CURRENT ASSETS | 118,585.52 |
| **FIXED ASSETS** | |
| TOTAL FIXED ASSETS | 0.00 |
| **OTHER ASSETS** | |
| LEASING COMMISSION | 8,783.97 |
| PREPAID INSURANCE | 168.26 |
| TOTAL OTHER ASSETS | 8,952.23 |
| TOTAL ASSETS | 127,537.75 |
| **L I A B I L I T I E S  &  C A P I T A L** | |
| **LIABILITIES** | |
| **CURRENT LIABILITIES** | |
| ACCOUNTS PAYABLE | 44,430.40 |
| ACCRUED EXPENSES | 5,924.35 |
| ACCCRUED PROPERTY TAXES | 20,520.06 |
| PREPAID RENTS | 15,777.18 |
| REFUNDABLE TENANT DEPOSITS | (60.00) |
| TOTAL CURRENT LIABILITIES | 86,591.99 |
| **LONG TERM LIABILITIES** | |
| TOTAL LONG TERM LIABILITIES | 0.00 |
| TOTAL LIABILITIES | 86,591.99 |
| **CAPITAL** | |
| NET PROFIT/(LOSS) | 40,945.76 |
| TOTAL CAPITAL | 40,945.76 |
| TOTAL LIABILITIES & CAPITAL | 127,537.75 |

**1068 M Arrowhead I, LLC - Debtor in Possession**
**INCOME STATEMENT**
For the 12 Months Ending December 31, 2009

January 18, 2010  2:10 PM
Page 1

|  | YTD Actual |
|---|---|
| **REVENUE** | |
| MINIMUM RENTS | 105,665.80 |
| ABATED RENT | (11,654.50) |
| JANITORIAL SERVICE | 1,982.00 |
| PARKING LOT INCOME | 2,745.00 |
| COUNTY TAX | (622.93) |
| CITY TAX | (2,740.84) |
| LATE CHARGES | 393.50 |
| NSF CHARGES | 25.00 |
| MISCELLANEOUS INCOME | 205.00 |
| | |
| GROSS REVENUE | 95,998.03 |
| | |
| **COMMON AREA MAINTENANCE** | |
| ALARM SVC/MAINT/REPAIRS-(CAM) | 298.10 |
| ELEVATOR MAINT.--(CAM) | 229.26 |
| HVAC-(CAM) | 2,204.70 |
| INSURANCE-LIABILITY (CAM) | 1,243.50 |
| JANITORIAL (CAM) | 3,641.47 |
| LANDSCAPING (CAM) | 1,573.13 |
| MAINTENANCE-(CAM) | (75.00) |
| PEST CONTROL (CAM) | 195.00 |
| POOL/FOUNTAIN MAINT/(CAM) | 611.00 |
| PROPERTY MANAGEMENT FEE (CAM) | 9,100.58 |
| PROPERTY TAXES (CAM) | 20,520.06 |
| SECURITY PATROL-(CAM) | 490.00 |
| SWEEPING (CAM) | 130.00 |
| TRASH REMOVAL (CAM) | 161.58 |
| UTILITIES | 3,926.19 |
| | |
| TOTAL COMMON AREA MAINTENANCE | 44,249.57 |
| | |
| **BUILDING EXPENSES** | |
| ADVERTISING (BLDG.) | 198.47 |
| DATA/CABLE/INTERNET | 848.00 |
| JANITORIAL--(BLDG) | 3,368.14 |
| LEASING EXPENSES-(BLDG) | 709.18 |
| TURNOVER EXPENSES | 225.00 |
| UTILITIES-BUILDING | (199.05) |
| | |
| TOTAL BUILDING EXPENSES | 5,149.74 |
| | |
| **OPERATING EXPENSES** | |
| BANK CHARGES | 10.00 |
| MANAGEMENT EXPENSE ALLOCATION | 5,709.97 |
| FEES & PERMITS | 60.55 |
| FORMS/LLC'S/SEC OF STATE | 75.00 |
| MISCELLANEOUS EXPENSES | (202.56) |
| | |
| TOTAL OPERATING EXPENSES | 5,652.96 |

Exhibit G - Financial Statments

**1068 M Arrowhead I, LLC - Debtor in Possession**
**INCOME STATEMENT**
For the 12 Months Ending December 31, 2009

January 18, 2010  2:10 PM
Page 2

| | YTD Actual |
|---|---|
| **OTHER EXPENSES** | |
| NET PROFIT/(LOSS) | 40,945.76 |

**1041 MAMMOTH ARROWHEAD I, LLC**
**BALANCE SHEET**
As At December 31, 2009

January 18, 2010  11:41 AM
Page 1

|  | YTD Actual |
|---|---|
| **A S S E T S** | |
| **CURRENT ASSETS** | |
| CASH IN BANK | 504,465.74 |
| ACCOUNTS RECEIVABLE | 155,520.11 |
| ALLOWANCE FOR BAD DEBTS | (100,307.37) |
| NOTES RECEIVABLE - ME, LLC | 1,434,812.20 |
| TOTAL CURRENT ASSETS | 1,994,490.68 |
| **FIXED ASSETS** | |
| LAND | 2,045,152.90 |
| BUILDING | 12,179,390.62 |
| ACCUM DEPR - BUILDING | (637,596.54) |
| TENANT IMPROVEMENTS | 16,639.11 |
| BUILDING IMPROVEMENTS | 27,995.37 |
| ACCUMULATED DEPR - IMPROVEMENTS | (14.09) |
| TOTAL FIXED ASSETS | 13,631,567.37 |
| **OTHER ASSETS** | |
| LEASING COMMISSION | 197,894.81 |
| ACCUM AMORT  LEASING COMMISSIONS | (98,616.29) |
| PREPAID INSURANCE | 1,937.58 |
| LOAN FEES | 515,871.00 |
| ACCUM AMORT - LOAN FEES | (437,790.75) |
| TOTAL OTHER ASSETS | 179,296.35 |
| TOTAL ASSETS | 15,805,354.40 |
| **L I A B I L I T I E S   &   C A P I T A L** | |
| **LIABILITIES** | |
| **CURRENT LIABILITIES** | |
| ACCOUNTS PAYABLE | 35,761.33 |
| ACCRUED INTEREST | 39,009.53 |
| ACCCRUED PROPERTY TAXES | 102,600.28 |
| REFUNDABLE TENANT DEPOSITS | 67,001.00 |
| TOTAL CURRENT LIABILITIES | 244,372.14 |
| **LONG TERM LIABILITIES** | |
| NOTES PAYABLE - COMERICA | 15,500,000.00 |
| NOTES PAYABLE - COMERICA LC RESERVE | (96,482.86) |
| NOTES PAYABLE - COMERICA INT RESERVE | (1,000,000.00) |
| TOTAL LONG TERM LIABILITIES | 14,403,517.14 |
| TOTAL LIABILITIES | 14,647,889.28 |
| **CAPITAL** | |
| CAPITAL | 1,085,621.72 |

**1041 MAMMOTH ARROWHEAD I, LLC**
**BALANCE SHEET**
As At December 31, 2009

January 18, 2010  11:41 AM
Page 2

|  | YTD Actual |
|---|---|
| NET PROFIT/(LOSS) | 71,843.40 |
| TOTAL CAPITAL | 1,157,465.12 |
| TOTAL LIABILITIES & CAPITAL | 15,805,354.40 |

**1041 MAMMOTH ARROWHEAD I, LLC**
**INCOME STATEMENT**
For the 12 Months Ending December 31, 2009

January 18, 2010  11:41 AM
Page 1

|  | YTD Actual |
|---|---|
| **REVENUE** | |
| MINIMUM RENTS | 1,180,706.70 |
| ABATED RENT | (71,014.90) |
| JANITORIAL SERVICE | 18,713.67 |
| PARKING LOT INCOME | 30,555.00 |
| COUNTY TAX | (381.47) |
| CITY TAX | (1,678.86) |
| EARLY LEASE TERMINATION FEE | 12,075.00 |
| LATE CHARGES | 2,355.48 |
| NSF CHARGES | 100.00 |
| WRITEOFFS | (9,234.01) |
| INTEREST EARNED | 4,273.65 |
| | |
| GROSS REVENUE | 1,166,470.26 |
| | |
| **COMMON AREA MAINTENANCE** | |
| ALARM SVC/MAINT/REPAIRS-(CAM) | 3,990.42 |
| ELECTRICAL REPAIRS (CAM) | 1,997.64 |
| ELEVATOR MAINT.--(CAM) | 6,147.92 |
| FIRE EXTINGUISH.--(CAM) | 100.00 |
| HVAC-(CAM) | 14,253.69 |
| INSURANCE-LIABILITY (CAM) | 14,379.75 |
| JANITORIAL (CAM) | 21,608.27 |
| LANDSCAPING (CAM) | 10,499.79 |
| LOCKS & KEYS (CAM) | 227.32 |
| MAINTENANCE-(CAM) | 7,506.15 |
| POWER WASH/STEAM CLEAN (CAM) | 2,180.00 |
| PEST CONTROL (CAM) | 660.00 |
| POOL/FOUNTAIN MAINT/(CAM) | 4,369.00 |
| PROPERTY MANAGEMENT FEE (CAM) | 52,232.93 |
| PROPERTY TAXES (CAM) | 231,160.91 |
| REPAIRS-CAM | 310.50 |
| SECURITY PATROL-(CAM) | 5,390.00 |
| SWEEPING (CAM) | 1,430.00 |
| TRASH REMOVAL (CAM) | 1,744.04 |
| UTILITIES | 31,382.85 |
| WINDOW CLEANING-(CAM) | 6,519.50 |
| | |
| TOTAL COMMON AREA MAINTENANCE | 418,090.68 |
| | |
| **BUILDING EXPENSES** | |
| ADVERTISING (BLDG.) | 13,155.53 |
| CONSULTING-(BLDG) | 700.00 |
| DATA/CABLE/INTERNET | 3,942.92 |
| DIRECTORIES/DOOR NAMES-(BLDG) | 2,741.68 |
| JANITORIAL--(BLDG) | 23,957.79 |
| LEASING EXPENSES-(BLDG) | 7,988.19 |
| TURNOVER EXPENSES | 14,420.28 |
| REPAIRS & MAINT.-BUILDING | 10,179.99 |
| UTILITIES-BUILDING | 16,219.04 |

**1041 MAMMOTH ARROWHEAD I, LLC**
**INCOME STATEMENT**
For the 12 Months Ending December 31, 2009

January 18, 2010  11:41 AM
Page 2

|  | YTD Actual |
|---|---|
| TOTAL BUILDING EXPENSES | 93,305.42 |
|  |  |
| **OPERATING EXPENSES** |  |
| ACCOUNTING EXPENSE | 8,005.00 |
| APPRAISAL FEES | 4,770.00 |
| BAD DEBT EXPENSE | 56,373.65 |
| BANK CHARGES | 369.62 |
| MANAGEMENT EXPENSE ALLOCATION | 18,914.78 |
| FORMS/LLC'S/SEC OF STATE | 20.00 |
| INTEREST EXPENSE | 440,807.64 |
| LEGAL EXPENSE | 40,816.27 |
| MISCELLANEOUS EXPENSES | 1,837.31 |
| PROFESSIONAL SERVICES | 8,826.49 |
| PROMOTION | 1,690.00 |
|  |  |
| TOTAL OPERATING EXPENSES | 582,430.76 |
|  |  |
| **OTHER EXPENSES** |  |
| FRANCHISE TAX | 800.00 |
|  |  |
| TOTAL OTHER EXPENSES | 800.00 |
|  |  |
| NET PROFIT/(LOSS) | 71,843.40 |

Exhibit G - Financial Statments